UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GOPALA KRISHNAN, MANIVANNAN SHANMUGAM, SAKTHIVEL PALANI GOUNDER, NANBAN VENTURES LLC, GSM ETERNAL LLC (A/K/A NORTHSTARS FINTECH), HIMALAYAN FINTECH LLC, and CENTUM FINTECH LLC (A/K/A SUNSHINES FINTECH),<br><br>Defendants. | FILED UNDER SEAL<br><br>C.A. No.:  4:23-cv-885 SDJ<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against Defendants Gopala Krishnan ("Krishnan"), Manivannan Shanmugam ("Shanmugam"), Sakthivel Palani Gounder ("Gounder"), Nanban Ventures LLC ("Nanban Ventures"), GSM Eternal LLC, a/k/a NorthStars FinTech ("GSM"), Himalayan Fintech LLC, ("Himalayan"), and Centum FinTech LLC, a/k/a Sunshines FinTech ("Centum") (collectively, "Defendants").

## I.  SUMMARY OF THE ACTION

1.      From at least April 16, 2021 to the present, Krishnan, Shanmugam, and Gounder ("Founders"), acting through their controlled "Nanban" companies, have raised at least approximately $129.7 million from over 360 investors in fraudulent securities offerings targeting members of the Indian community in the DFW-area, including approximately $89.8 million for five "Nanban" branded private investment funds that Nanban Ventures offered to retail investors,

and $39.9 million from selling high-yield promissory notes to so-called "friends and family" investors through GSM, Himalayan, and Centum ("Founder Companies").

2.    To raise additional investments and keep their fraudulent enterprise afloat, the Defendants have been overstating the profitability of the investments and paying investors and themselves millions of dollars in fake profits using, in substantial part, other investor funds ("Ponzi payments").

3.    To raise investor funds in the first instance, Defendants made multiple misrepresentations and omissions to investors.  Defendants told the fund and note investors that they would invest their money using "GK Strategies," which Krishnan (who goes by "GK") falsely claimed is a proprietary options trading method that never loses money and outperforms the stock market.  In reality, Krishnan and the other Founders grossly misrepresented the nature and performance of GK Strategies to lure investors.

4.    Defendants also misrepresented the funds' investments and concealed conflicts of interest.  Defendants told investors that the funds would trade using GK Strategies and also invest in start-up technology companies and real estate.  Nanban Ventures then provided fund investors a statement of investments purporting to show that most of the funds' assets were invested in three "fintech" companies.  "Fintech" refers to companies that use technology to improve financial services.  But here, the so called "fintech" companies were actually the Founder Companies, which are simply other "Nanban" companies that the Founders control and disguised to appear as third-party fintech companies.

5.    In fact, Nanban Ventures and the Founders did not invest the majority of the funds' assets as represented.  Instead, they purportedly invested most of the assets in unsecured promissory notes issued by the related-party Founder Companies – companies that are not

engaged in fintech business and have little or no assets other than investor funds or assets purchased with investor funds.

6.     Nanban Ventures and the Founders also acted as investment advisers to the funds, and, therefore, owed a fiduciary duty to the funds.  They blatantly breached this duty by putting the Founders' interests ahead of the funds' interests, engaging in and profiting from undisclosed conflicts of interest, and misusing fund assets in a manner that was inconsistent with the fund documents, including by entering into the related-party notes and taking excess compensation.

7.     By their misconduct, Defendants violated the antifraud provisions of the federal securities laws.  The SEC brings this action seeking injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, civil penalties, officer and director bars, and all other equitable and ancillary relief the Court deems just and proper.

## II.  JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)], and Sections 209(d) and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d) & 80b-14].

9.     The limited-partnership units and investment notes offered, purchased, and sold, as alleged herein, are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c].

10.     Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate

commerce, and the mails in connection with the transactions, acts, practices, and/or courses of business alleged herein.

11.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district. Defendants also reside and transact business in this district.

### III.  DEFENDANTS

12.    Defendant Krishnan is an individual residing in Frisco, Texas.

13.    Defendant Shanmugam is an individual residing in Frisco, Texas.

14.    Defendant Gounder is an individual residing in Frisco, Texas.

15.    Defendant Nanban Ventures is a Texas limited liability company with its principal place of business in Plano, Texas.  The Founders own and control Nanban Ventures through intermediary entities, with Krishnan owning 42.5%, Gounder owning 21.25%, Shanmugam owning 21.25%, and an additional partner owing 15%.

16.    Defendant GSM is a Texas limited liability company with its principal place of business in Plano, Texas.  The Founders own and control GSM through intermediary entities, with Krishnan owning 50%, Gounder owning 25%, and Shanmugam owning 25%.  The Founders are signatories to GSM's bank accounts and have access to its brokerage accounts.

17.    Defendant Himalayan is a Texas limited liability company with its principal place of business in Plano, Texas.  The Founders control and, upon information and belief, own Himalayan through intermediary entities, with Krishnan owning 50%, Gounder owning 25%, and Shanmugam owning 25%.  The Founders are signatories to Himalayan's bank accounts.

18.     Defendant Centum is a Texas limited liability company with its principal place of business in Plano, Texas.  The Founders own and control Centum through intermediary entities, with Krishnan owning 50%, Gounder owning 25%, and Shanmugam owning 25%.  The Founders are signatories to Centum's bank accounts and have access to its brokerage accounts.

## IV.  FACTUAL ALLEGATIONS

### A. Origin of the Nanban Entities and GK Strategies

19.     "Nanban" is a Tamil word meaning "friend."

20.     In or around 2020, the Founders began using various "Nanban" branded entities to promote what they claim is a propriety and purportedly highly successful options trading system called "GK Strategies."  According to Krishnan, who goes by "GK," GK Strategies encompasses five levels of increasingly complex trading methods.  Krishnan dubbed these various levels as "GK Strategies Level One," "GK Strategies Level Two," *et seq*.

21.     Krishnan and the other Founders had careers in the IT industry.  They have little or no experience or training in the investment industry.

22.     Before 2020, Krishnan primarily offered his GK Strategies to friends and family on an ad hoc basis.  In the spring or early summer of 2020, the Founders launched the first of several for-profit hedge funds to employ GK Strategies.

23.     In July 2020, the Founders founded the Nanban Foundation, with the purported charitable purpose of helping "Nanbans" achieve financial freedom by teaching GK Strategies Levels One and Two.

24.     However, the Nanban Foundation's primary purpose was to recruit potential investors for the hedge funds.  Through word-of-mouth in the DFW-area Indian community, as

well as Krishnan's YouTube videos touting his purported successes using GK Strategies, prospective investors connected with the Nanban Foundation.

25.     The Nanban Foundation offered prospective investors free webinars where they could learn GK Strategies Levels One and Two.  However, prospective investors were told that they would have to invest in Nanban's hedge funds if they wanted to maximize their returns using GK Strategies Levels Three through Five.

26.     From 2020 until approximately September 2021, the Founders raised approximately $116.5 million from approximately 395 investors for four successive hedge funds. All four hedge funds underperformed the S&P 500 Index.  The last two hedge funds realized annual returns that significantly underperformed the S&P 500 index.

27.     Due to the poor performance of the last two hedge funds, many investors complained about the returns and requested their money back.  The Founders closed the last two hedge funds as a result of the redemption requests and returned the hedge fund investors' original capital, along with a small purported profit.

28.     Unbeknown to investors, these payments to the hedge fund investors were sourced, at least in part, from a commingled bank account containing money from other, subsequent investors, as alleged further below.

29.     The Founders claim that they have relinquished control of the Nanban Foundation to their wives, who are members of Nanban Foundation's board of directors.

**B.  Nanban Ventures and the VC Funds**

30.     In March 2021, the Founders formed Nanban Ventures.  Nanban Ventures, as alleged in more detail below, is an unregistered investment adviser firm that the Founders and a fourth partner own, manage, and control.

31.     When investors became dissatisfied with the performance of the hedge funds, the Founders pivoted from the hedge funds to so-called venture capital funds ("VC Funds").   The VC Funds are private investment funds.

32.     Unlike the hedge funds, Krishnan and other Nanban representatives told investors that the VC Funds would generate returns for investors from other investments beyond GK Strategies.  The VC Funds would: (1) engage in trading using GK Strategies; (2) invest in start-up companies, primarily in the technology sector; and (3) make real estate investments.

33.     From approximately May 2021 to July 2023, the Founders, acting through Nanban Ventures, raised approximately $89.8 million from over 350 investors ("VC Fund Investors") in multiple states by selling limited partnership units in five VC Funds.  The following chart summarizes the offerings:

| VC Fund | Raise Period | Investors | Amount Raised |
|---|---|---|---|
| Capital | May 11, 2021 – July 18, 2023 | 105 | $25,509,592 |
| AAA | Sept. 17, 2021 – July 18, 2023 | 99 | $5,426,494 |
| Ganga | Dec. 10, 2021– July 18, 2023 | 95 | $19,280,193 |
| Abundance | Dec. 27, 2021 – July 18, 2023 | 6 | $23,325,000 |
| Nile | Aug. 26, 2022 – July 18, 2023 | 81 | $16,266,872 |
| **Total Raised:** | | | **$89,808,151** |

34.     The VC Fund Investors were also offered the opportunity to either receive purported profit distributions or reinvest their purported profit distributions back into the VC Funds.  Most investors chose to reinvest their purported profits.  VC Fund Investors purchased over $12.5 million dollars of additional units in the VC Funds by reinvesting their purported profit distributions.

35.     Through at least July 2023, Nanban Ventures continued to solicit additional investments ("top off investments") from existing VC Fund Investors, whereby the investors could buy additional units to add to their existing VC Funds' investments.

36.     As with the hedge funds, Nanban Ventures obtained VC Fund investors, *inter alia*: (a) through referrals from the Nanban Foundation, and (b) when individuals were routed to Nanban Ventures after watching one of Krishnan's YouTube videos.  Most of the VC Fund investors are retail investors that are members of the Indian community in the DFW-area or other parts of the United States.

37.     Nanban Ventures is an unregistered investment adviser the Founders formed to raise money for, and provide investment advice to, the VC Funds.  Nanban Ventures' advisory clients are the VC Funds.  Similarly, the Founders and the new partner were the designated portfolio managers for the VC Funds, and they were the individuals who provided the investment advisory services to the VC Funds and selected the investments for the VC Funds.  The Founders and the new partner met to discuss and evaluate the performance of the VC Funds and to make investment decisions for the funds.

38.     Nanban Ventures and each of the Founders provided investment advice to the VC Funds for compensation in the form of a 2% management fee based on the total Assets Under Management ("AUM").  Nanban Ventures and each of the Founders were each engaged in the business of advising the VC Funds as to the advisability of investing in, purchasing, or selling securities, including when it directed the VC Funds to obtain equity investments in start-up companies and to purchase the Related Party Notes (defined and described below).

39.     Krishnan's investment advice primarily focused on advising the VC Funds regarding trading using GK Strategies, with Shanmugam and Gounder also advising in this

regard.  Each of the Founders used VC Fund capital to trade using GK Strategies in GSM's brokerage accounts.  Shanmugam also advised the VC Funds about their real estate investments. Gounder served as chief investment officer of Nanban Ventures and assisted in vetting start-up companies.  The Founders also brought in a new partner to advise on the VC Funds' investments in start-up companies.

40.     The Founders also formed a separate management entity and a general partner entity for each fund (except the Capital Fund).  For the Capital Fund, Nanban Ventures served as both the management entity and the general partner entity.  The Founders manage and control the VC Funds' management entities and general partners.

41.     The VC Funds were required to pay their respective management entity a 2% AUM fee and to pay the general partner entity a share of any profits that exceeded 12-15%.  The source of compensation for the Founders and Nanban Ventures included advisory fees that the VC Funds paid for investment advisory services, namely, the 2% AUM fee, which the Founders and Nanban Ventures received directly or through the VC Funds' management entities.

**C. The Note Investors**

42.     In addition to promoting and soliciting investments in the VC Funds, the Founders also offered and sold high-yield promissory notes ("Investment Notes") to investors ("Note Investors").  One or more of these investors invested in the Investment Notes, because the investor did not want to participate in the VC Funds or the earlier hedge funds, but did want to make investment returns from GK Strategies.

43.     The Founders sourced the Note Investors through their ties to the Indian business community, the Nanban Foundation, or through their previous careers in the IT sector.  Most of

the Note Investors are high-net worth individuals in the Indian community or companies they control.

44.     Between April 16, 2021 and July 18, 2023, the Founders raised approximately $39.9 million in investments from approximately 10 Note Investors through at least 15 Investment Notes issued by the Founder Companies.

45.     The Investment Notes obligated the issuing Founder Company to make interest payments of 18% per year to the Note Investors, usually for a period of five years, in exchange for the principal investments.

46.     Krishnan told Note Investors that he would use GK Strategies or other "cash-flow" strategies to protect their principal while turning a profit.  For example, in approximately the Spring of 2020, Krishnan told a Note Investor located in Texas that with GK Strategies, he could make 20-25% returns while never losing more than 1-2% of his invested capital.

47.     As another example, in approximately the Spring of 2021, Krishnan told a Note Investor also located in Texas that his GK Strategies trading system earned investors annual returns of 20-40%.  To avoid paying fees associated with investing in the VC Funds, Krishnan recommended that the Note Investor purchase an Investment Note to invest directly in GSM, which Krishnan represented made trades using GK Strategies.

**D.  The VC Fund Units and the Investment Notes are Securities**

48.     Section 2(a)(1) of the Securities Act and Section 3(a)(1) of the Exchange Act define "security to include, among other instruments, any "investment contract" or "note."

49.     The limited-partnership units in the VC Funds are "investment contracts" under the Securities Act and the Exchange Act.  Investors invested their money to obtain an investment return and the funds were pooled with funds from other investors.  These were entirely passive

investments, and investors had no role or say in the operations or management of the VC Funds or the underlying fund investments. The VC Fund Investors were entirely dependent upon, and expecting to profit solely from, the Founders' expertise and efforts to manage the VC Funds and to select and manage the funds' underlying investments. Moreover, the VC Fund's offering documents specifically identify the limited-partnership units as securities.

50.    The Investment Notes are also securities under the Securities Act and the Exchange Act, which specifically include the term "notes" within the definition of securities. In addition, the Investment Notes are "investment contracts." Investors invested money to obtain fixed investment returns of 18% per year, typically for a period of five years. The Note Investors' funds were pooled. The Investment Notes were entirely passive investments, and Note Investors had no role or say in the operations or management of the Founder Companies. The Note Investors were entirely dependent upon, and expecting to profit solely from, the Founders' expertise and efforts to trade using GK Strategies.

51.    No registration statements have ever been filed with the SEC or are in effect as to any offerings of the limited-partnership units in the VC Funds or the Investment Notes.

**E.  Nanban Ventures and the Founders Misrepresented GK Strategies**

52.    Defendants made multiple misrepresentations and omissions about GK Strategies to the VC Fund Investors and Note Investors. As alleged in more detail below, the misstatements and omissions were made in the VC Funds' Private Placement Memorandum ("PPMs"), in videos and podcasts posted on the internet that remain available online, in investor web presentations, and orally to VC Fund Investors and Note Investors.

53.    The Founders and Nanban Ventures made these misstatements and omissions about GK Strategies to investors in connection with the offers, purchases, and sales of the

limited-partnership units in the VC Funds (including reinvestments therein) and the Investment

Notes.  The misrepresentations and omissions include the following (emphasis added):

      a.      On December 2, 2020, Krishnan represented during a Better Wealth

Podcast titled *Making a Killing With Index, Options, and The Asset with CEO of Nanban*

*Investments* that was posted and remains available on YouTube that:

> I started sharing with my friends and family my level 1, level 2
> strategies, and **I copyrighted all of my five strategies under GK**
> **Strategies copyright**. So first two strategies, level 1, level 2,
> allows people to generate 18 to 30 percent on their own, okay,
> from cash flow perspective.  My level 3, level 4, level 5 takes it to
> a completely different level. We, **we consistently generate more**
> **than a hundred percent in the higher level strategies….in any**
> **market condition**. That's the beauty, up, sideways, down market.
>
> So from 2009 till early part of 2020, volatility was low, right? . . .
> And our returns were between 18 to 24 percent still. . . . But with
> this year when volatility increased, you have no idea.  **Our people**
> **are making 60 percent, 70 percent return this year**.
>
> Since 2001, **my worst year has been 21 percent up**.
>
> Just to tell you, in private fund **we are able to give 58 percent**
> **return every year**.
>
> But in Nanban Investments, which is our for-profit private fund
> business, let's say they invest hundred K. So that is their hundred
> K capital into our business.  In the first year we would give them
> $58,000 return. That's 58 percent return.  That's what we
> specialize in.  **Even though we make more than hundred**
> **percent, we give 58 percent only to the investors**, rest goes to the
> company, and we do a lot of charitable work using that income.

      b.      The PPMs for the VC Funds represent that Krishnan will use GK

Strategies to outperform the market, as illustrated by the following statement from the Nanban

Ventures AAA Fund PPM, which appears in similar form in the other VC Fund PPMs:

> [Krishnan] has been using "GK Strategies" to generate consistent
> returns from US financial market for himself and for his friends
> and family members.

> As Chief Executive Officer and Portfolio manager of Nanban Investments LLC. **[Krishnan] is managing the private equity fund(s) to generate returns that will consistently over perform the S&P 500 Index. To achieve those kind of returns, [Krishnan] will be using his proprietary strategies**.

When asked to explain his claims that GK Strategies over performs the S&P 500 Index, Krishnan testified that he told investors that "[a]s long as the S&P 500 doesn't go to zero, my strategy **will outperform [the] S&P 500**" and do so "**[a]ll the time**" and "**it will beat the S&P 500 from cash flow perspective 100 percent of the time**."

       c.     On December 21, 2022, Krishnan represented, during an interview titled *Episode #79 GK's Way to Financial Freedom featuring Nanban GK* that was posted and remains available on YouTube, that:

> I don't even care if the market has dropped by 20 percent because I know every month with 100 percent consistency and we will get cash. … So, when you are getting cash every week, every month with 100 percent consistency, your second bank account will always. **It cannot go down**.

> …it only takes one hour a week to do my strategies. That's all because it's purely mechanical. You don't look at any reports, no indicators, no charts. So, when I saw their lifestyle has improved so much because they have got that belief in their mind that my 600,000 is going to be safe, and **I am making every year 120,000, minimum at 20 percent . … And in this market, the current market that is going on, the S&P is down 20 percent, volatility has gone up big time, people are going to make 40, 50 percent this year**… So that's the beauty of volatility [in our] strategy.

       d.     On August 9, 2021, Krishnan represented, during an interview on FunAsia Radio titled *Gopala Krishnan GK | Nanban Interview* that was posted and remains available on Facebook, that:

> So in 2000 – from 2001 (inaudible) and I figured out that **this strategy works hundred percent of the time**. I didn't keep it with me because I believe in community growing together.

> **From 2001 until now, consistent results**... And that is key to
> success.
>
> **So when you are making cash flow every week with 100
> percent consistency, all those amounts would add up to big
> profits later**.

   e.  On November 5, 2021, during an interview titled *Gopala "GK" Krishnan,*

*Chairman & CEO, Nanban Group of Companies*, *DotCom Magazine Exclusive Interview* that

was posted and remains available on YouTube, Krishnan represented that:

> So Nanban came into existence just 18 months ago because of the
> strategies called, "GK Strategies," that I had developed back in
> 2001, which had worked for me [and] my family office for many,
> many years, **with principal protection and consistent positive
> returns in any market conditions**.

   f.  On January 31, 2023, Krishnan represented during a Nanban Growth Fund

webinar made available online to potential investors that:

> So, it's a very, very diversified strategy that has been working in
> Nanban Ventures and **Nanban Ventures has delivered for the
> last 18 months consistent double-digit returns**.

   g.  On May 19, 2023, Krishnan represented during a telephone call with a

potential investor that:

> If you only want to participate in GK Strategies, that is our Nanban
> Hedge Fund where the minimum now is $100 million … that is
> where we apply level 1 to level 5 all the strategies to generate
> around 30% every year that is what our goal is through our Nanban
> Hedge Fund.  And then we have the next best is Nanban Ventures
> where 60% of the capital goes to GK strategies, 20% goes to all
> kinds of real estate, and only 20% goes to all kinds of startups….
> So our people are getting returns every year…. Our investor, who
> put $10 million is getting minimum, you know, around 20% a year.

> What I meant in this podcast was, I think in 2020, the volatility in the market was very high. So GK strategy itself, would have generated 50, 60, 70% [e]very year instead of 20, 30%.

      h.     In the spring of 2020, Krishnan told a Note Investor in Texas during a webinar that GK Strategies Levels One and Two would earn double-digit returns of 20-25 percent while at the same time being a conservative investment strategy that protected investor capital.  He told the investor that GK Strategies would never lose more than 1-2 percent of an investor's capital and that his system *always* beat the stock market and an index like the S&P 500.  Krishnan also told the investor that if he wanted to earn even higher returns from GK Strategies Levels Three, Four, and Five, he would have to invest directly with Krishnan and could earn an extra 5-15 percent in annual returns.

      i.     On October 19, 2022, Krishnan represented during a Global Summit webinar made available online to potential investors that:

> So everything goes back to, within Nanban, Nanban is powered by GK Strategies…. It's after my name. **And it's copyrighted and patented in U.S.** So we use those strategies to make money.

54.    The statements in paragraph 53 are false and misleading, because GK Strategies is not "proprietary," "copyrighted," "patented," or even "unique."  There is no algorithm or other proprietary technology or method underpinning GK Strategies.  GK Strategies is merely a covered call option investment strategy with put protection.  This is a widely known and publicly available technique.

55.    The statements in paragraph 53 are also false and misleading, because GK Strategies does not consistently outperform the S&P 500 index, which is a proxy for the public stock market.  To the contrary, GK Strategies only does so in limited market scenarios.

56.     The statements in paragraph 53 are also false and misleading, because GK Strategies does not always generate positive returns, and there are market conditions where GK Strategies generates negative returns.

57.     The statements in paragraph 53 are also false and misleading, because, at the time they were made, GK Strategies had not consistently outperformed the S&P 500 index or obtained the high percentage returns that Krishnan claimed.  Trading records demonstrate that GK Strategies has not produced returns consistently exceeding the returns of the S&P 500 index. To the contrary, the returns were, with limited exceptions, lower than the returns of the S&P 500 index, lower than the percentage returns that Krishnan claimed, and negative on numerous occasions.

58.     The statements in paragraph 53 are also false and misleading, because the Founders and Nanban Ventures omitted (a) their actual returns using GK Strategies and (b) that two Nanban hedge funds—which used GK Strategies—were closed, in part, due to investor complaints about poor performance.  These omissions were highly misleading in light of the other statements that the Founders and Nanban Ventures made about the performance of GK Strategies.

59.     Nanban Ventures also falsely told hedge fund investors—that they were also soliciting to invest in the VC Funds—that they were offering an exit to the hedge funds, because they could not fully deploy GK Strategies to protect intellectual property while they were under an SEC review.   In fact, the hedge funds were actually closed because investors asked for their money back due to the hedge funds' poor performances, not to protect intellectual property in connection with an "SEC review" or otherwise.

60.     The Founders and Nanban Ventures made the misstatements and omissions alleged above.  As described above, Krishnan made most of the statements himself, and the other Founders also participated in one or more in-person meetings with Note Investors in which the misrepresentations were made.  All of the Founders and Nanban Ventures made the statements in the PPMs, because each of the Founders reviewed and approved the PPMs and they each had final authority over the contents of the PPMs.

61.     The Founders knew, or were severely reckless in not knowing, that their statements and omissions about GK Strategies were false and misleading.  The Founders made trades using GK Strategies in the hedge funds both independently and in concert.  Therefore, the Founders knew, or was severely reckless in not knowing, that GK Strategies did not perform as represented in the hedge funds.  They perpetuated this misrepresentation when they authorized VC Fund Investors to receive PPMs claiming that Krishnan would apply proprietary strategies that would generate returns that would consistently over perform the S&P 500 Index.  Additionally, the Founders all knew that the last two Nanban hedge funds were closed due to the poor performance of GK Strategies.  The Founders were also severely reckless because they did not analyze Krishnan's historical trading performance using GK Strategies prior to including the claim that the "proprietary strategies" would consistently over perform the S&P 500 Index in the VC Funds' PPMs.

62.     These misrepresentations and omissions were material, because a reasonable investor would consider the fact that GK Strategies was not unique and did not have investment returns as represented in deciding whether to invest.

**F.  Defendants Misrepresented Profits Earned and Misused Investor Funds**

63.     After Defendants induced investors to purchase the VC Fund units and the

Investment Notes based on their false narrative of Krishnan's investing success, they misrepresented the performance of those investments (VC Funds and Investment Notes) and misused investor funds to induce additional investments and to keep their fraudulent enterprise afloat.  In particular, Defendants misused investor funds by using at least approximately $17.8 million of investor funds to make Ponzi payments—purported *profit* distributions to investors using, in substantial part, other investor funds.

> **i.    *Profitability Misstatements to VC Fund Investors***

64.    The Limited Partnership Agreement ("LPA") for each VC Fund provides that investors are entitled to receive profit distributions if there is a positive net amount resulting from the allocation of profit and loss.  The LPAs further provide that the VC Fund Investors may elect to take distributions of their share of these profits in cash or to reinvest the amount back into the respective VC Funds in exchange for additional units.

65.    Nanban Ventures consistently represented to the VC Fund Investors at investor update webinars that all the Founders typically attended that the VC Funds were highly profitable.  In total, between April 16, 2021 and July 18, 2023, Nanban Ventures, through its third-party fund administrator, told VC Fund Investors that the VC Funds had generated approximately $23.2 million in purported profits.

66.    In a webinar with investors in or around January 2023, Nanban Ventures, at the Founders' direction, provided the VC Fund Investors with a Schedule of Investments ("SOI") purportedly showing that the VC Funds had achieved profits of approximately $10 million in the second half of 2022.

67.     As alleged at paragraph 53 above, on a May 19, 2023 telephone call, Krishnan also represented to a potential investor  that VC Fund investors were receiving minimum returns of 20% per year every year.

68.     As another example, during a July 7, 2023 Nanban Ventures Fund Performance Review Webinar, Nanban Ventures' CFO represented to VC Fund Investors that the VC Funds had achieved profits of approximately $10.3 million from January 2023 to June of 2023 from the "fintechs" alone.

69.     Believing the VC Funds to be highly profitable, most investors chose to reinvest their share of purported profits in the VC Funds.

70.     A smaller subset of investors chose to receive their share of purported profits as cash distributions.  Between April 16, 2021 and July 18, 2023, the Founders caused the VC Funds to make purported profit payments of approximately $10.7 million to those investors. These payments were themselves a representation of the VC Funds' purported profitability.

71.     The Founders also made interest payments to the Note Investors, including interest payments that, at times, exceeded the 18% amount listed on the face of the Investment Notes.  These payments were purportedly based on GK Strategies' trading profits exceeding 18%.  The interest payments to the Note Investors were, themselves, deceptive acts and false representations of profitability to the Note Investors.

72.     Defendants' representations about the profitability of the VC Funds and Investment Notes were false and misleading.  When the statements were made, the VC Funds had not achieved the represented profits.  In fact, the VC Funds could not have achieved the represented profits because the VC Funds achieved, *at most*, only $1.97 million in profits during the *entire* period of April 16, 2021 through July 18, 2023, most of which was actually derived

from the sale of real estate.  This amounts to a return of only 2.2%.  During the same period, the

Founder Companies suffered a net trading loss, and therefore did not have trading profits to

support payments to Note Investors, let alone payments that exceeded 18%.

73.     As alleged below, any other purported profits were illusory.  Specifically, any

other so-called profits to the VC Funds were not investment profits from fund investments in GK

Strategies, start-up companies, or real estate.  Instead, they were merely interest payments on

related-party promissory notes entered into between the Founder Companies and other

companies the Founders controlled.

*ii.    Ponzi Payments to VC Fund, Note, and Hedge Fund Investors*

74.     Between April 16, 2021 and July 18, 2023, the Founders and Nanban Ventures

caused the VC Funds to pay approximately $10.7 million dollars to VC Fund investors who

chose to receive purported profit distributions instead of reinvesting their profits.

75.     Between April 16, 2021 and July 18, 2023, the Founders caused the Founder

Companies to pay approximately $21.04 million in interest payments and return of principal to

Note Investors.

76.     At least approximately $17.8 million of these payments to VC Fund Investors and

Note Investors (as alleged in the previous two paragraphs) were Ponzi payments that were

sourced with funds from other investors.

77.     Additionally, in August 2022, the Founders closed out their two remaining hedge

funds and purported to return the hedge fund investors' principal with a small amount of profit.

In reality, the hedge funds did not have enough money in their account to make these.  Instead,

the Founders caused the Founder Companies to pay approximately $3.5 million to the hedge

fund investors using investor funds received from the VC Fund Investors and the Note Investors.

At least approximately $2.3 million of this $3.5 million was paid to hedge fund investors after the hedge funds had ceased operations.  Consequently, the hedge fund investors received $2.3 million in Ponzi payments.

### d.  Improper Payments to the Founders and Nanban Ventures

78.     Defendants also misused investor funds to compensate the Founders.  The PPMs disclose to the VC Fund Investors that the Founders, through related entities, would make money in two ways: (a) a 2% AUM fee, and (b) the general partner of the VC Fund's share of any profits that exceeded 12-15%.

79.     The Founders did not disclose to Note Investors that they would take any portion of their principal investments for themselves, and at least one Note Investor in Texas specifically invested in an Investment Note and not a VC Fund to avoid paying AUM and general partner fees.

80.     Yet, between July 29, 2021 and June 20, 2023, the Founders, acting through the Founder Companies, paid themselves at least approximately $6 million from commingled investor funds, including payments of approximately $3.3 million to Krishnan, $1.8 million to Gounder, and $900,000 to Shanmugam.  In addition, the VC Funds transferred approximately $2 million in compensation to the VC Funds' general partner entities and management entities, including Nanban Ventures.  These payments were not authorized by the VC Funds' documents and were also made, at least in substantial part, using investor funds.

81.     Defendants knew, or were severely reckless in not knowing, that their misstatements and omissions about the profitability of the investments were false and misleading and that they were misusing investor funds.  The Founders oversaw the investments for the VC Funds and the Founder Companies, participated in meetings about the status of the investments,

and controlled the relevant bank accounts.  As a result, the Founders knew, or were severely reckless in not knowing, that the VC Funds and Founder Companies were vastly overstating their profits.  The Founders likewise knew that they were commingling investor funds and using investor funds to pay false profit distributions and themselves.

82.    As alleged at paragraphs 37-39 above, the Founders and Nanban Ventures are investment advisers to the VC Funds.  They breached their fiduciary duty to the VC Funds by using fund assets in a manner that was not authorized by the VC Funds' documents, including the operative PPMs and limited partnership agreements.

83.    The misuse of investor funds and the related misstatements and omissions are material, because a reasonable investor would consider the facts that they were receiving purported profit payments that were actually sourced from other investors' funds and that their investment was not profitable, or at best significantly less profitable than represented, important in deciding whether to invest or reinvest.

### G.  Defendants Misrepresented the Investments and Hid Self-Dealing

#### i.  The Fake "Fintech" Companies

84.    During a biannual investment meeting in or about January 2023, Nanban Ventures, at the Founders' direction, provided investors with the Statement of Investments (as previously defined, "SOI").

85.    The SOI represented that the VC Funds had invested $56 million (over 69% of the VC Funds' total assets) into three purported "fintech" companies identified as "NorthStars FinTech," "Himalayan FinTech," and "Sunshines FinTech."  The SOI stated that these fintech investments had generated revenue of over $8 million for the VC Funds.  Many VC Fund

investors reinvested their purported profits to purchase additional VC Fund units after receiving the SOI.

86.    "NorthStars FinTech" (which is an assumed name for Defendant GSM), "Himalayan FinTech" (which is Defendant Himalayan), and "Sunshines FinTech" (which is an assumed name for Defendant Centum) are not third-party companies.  These are the Founder Companies, and they are all entities controlled by the Founders.  The Founders' control of these entities was not disclosed to investors.

87.    The Founder Companies are also not fintech companies.  GSM is a company that the Founders use to trade investor funds using GK Strategies, to issue Investment Notes, to make false profit distributions, and, in some instances, to purchase real estate.  Centum is an intermediary entity that the Founders use to issue Investment Notes, to shuttle investor funds to GSM, to make false profit distributions, and, in some cases, to purchase bonds and real estate.  Himalayan is an intermediary entity that the Founders use to issue Investment Notes, to shuttle investor funds to GSM and Centum, and to make false profit distributions.

88.    The Founder Companies are not engaged in the development of specific technologies used to enhance financial services, or engaged in any other activity that would characterize the entity as a fintech company.

89.    The Founder Companies have substantially no assets other than investor funds or assets purchased with investor funds.

90.    The Founder Companies are, in essence, undercapitalized companies that engage in no business other than receiving investor funds and trading or investing on behalf of the Founders using investor funds.  There were no fintech investments.

### ii. The Related Party Notes

91.    The VC Funds did not use investor funds to trade using GK Strategies as represented.  Instead, Defendants structured the VC Funds' purported GK Strategies investments as a series of unsecured investment loans ("Related Party Notes") evidenced by approximately 10 convertible promissory notes between the Founder Companies (as payors) and another VC Fund-related intermediary that the Founders also controlled (as payees).

92.    The Related Party Notes totaled more than $70 million dollars, which includes the $56 million falsely referenced in the SOI as fintech investments.

93.    The Founders commingled investor funds from all VC Fund Investor funds in one bank account, and then further commingled the funds in the bank accounts of various special purpose entities that the Founders controlled.

94.    From there, the Founders, using the Related Party Notes, transferred more than $70 million dollars of VC Fund Investor funds to the Founder Companies where the funds were commingled with Note Investor funds.

95.    The Related Party Notes, which were not disclosed to investors, purportedly require the Founder Companies to pay 18% biannual interest to the intermediary Nanban companies, typically over a term of five years.  The Related Party Notes do not give the VC Funds any ownership stake in the underlying companies or their investments.

96.    The Founders also take the position that the Founder Companies are only required to pay interest on these Related Party Notes on a "best efforts basis."

97.    Even if the Founder Companies or their investments are highly profitable, and the Founder Companies choose to pay the interest (because they apparently claim that it is not required), the VC Funds' profits are purportedly capped at 18%.  Meanwhile, the VC Fund

Investors have no protection if these uncapitalized entities fail to pay off the Related Party Notes, which are unsecured.

98.     As a result, more than 78% of the VC Funds assets were deployed to the Related Party Notes.  Nanban Ventures and the Founders used the Related Party Notes to create the false appearance of investment profit.

99.     The Founders and Nanban Ventures did not disclose—and in fact actively concealed using assumed names—that the so-called fintech companies were the Founders' controlled entities and were not fintech companies.  The Founders and Nanban Ventures also did not disclose that the investments in the Founder Companies were loans, much less related-party loans.  The Founders and Nanban Ventures further failed to disclose that most of the VC Funds' capital was deployed to these purported Related Party Notes.

100.    In addition to the SOI used to deceive VC Fund Investors, Krishnan also attempted to mislead a potential VC Fund Investor in a January 31, 2023 investor pitch.  During that investor pitch, Krishnan did not disclose his ownership or control of the Founder Companies, the loan structure, or that profits were tied to GK Strategies. Rather, Krishnan stated generically that Nanban Ventures was invested in "some very strategic **private companies** that are already producing cash flow." Krishnan further gave the impression that the companies were arms-length third parties by stating, "**[t]hey** don't want to go public, but **they** all have been generating really good cash flow. **They** are allowing **us** to participate in their company."

101.    The Founders and Nanban Ventures knew, or were severely reckless in not knowing, that their misstatements and omissions about the VC Funds' investments were false and misleading.  The Founders knew that they controlled the Founder Companies, and that these companies were neither independent third-party companies nor fintech companies.  The

Founders also met regularly to discuss the VC Funds' investments, so they knew, or were severely reckless in not knowing, that investor funds were being used to fund the purported loans between Nanban entities.  Gounder signed most or all Related Party Notes on behalf of GSM.

102.    As alleged at paragraphs 37-39 above, the Founders and Nanban Ventures are investment advisers to the VC Funds.  They breached their fiduciary duties to the VC Funds by, among other things, entering into the Related Party Notes, which were not in the VC Funds' best interest, and by failing to fully and fairly disclose that the VC Funds were investing in the Founder Companies.

103.    The misstatements and omissions about the VC Funds' investments were material, because a reasonable investor would consider the existence of a conflict of interest and the fact that their investment funds had not been invested as represented important in deciding whether to invest.

104.    The Related Party Notes are securities under the Securities Act and the Exchange Act, which specifically include the term "notes" within the definition of securities.  In addition, the Related Party Notes are "investment contracts."  The VC Funds, through related entities, invested money to obtain fixed investment returns of 18% per year, typically for a period of five years.  The VC Funds money was pooled with funds from other VC Funds and Note Investors. The VC Funds were entirely dependent upon, and expecting to profit solely from, the Founders' expertise and efforts to trade using GK Strategies.

105.    The Founders owned and controlled Nanban Ventures and each of the Founder Companies.  Acting as a principal for their own accounts, the Founders sold the Related Party Notes to their advisory clients, the VC Funds.

106.    Before the completion of the transactions in which the Founders sold the Related

Party Notes, the Founders did not: (a) disclose the transactions in writing to their clients, (b) disclose the capacity in which they were acting, and/or (c) obtain the consent of the clients to engage in such transactions.

### H. Krishnan Misrepresented Nanban Ventures' AUM

107.    To convince investors to invest in the VC Funds, Krishnan made several additional misrepresentations to investors about Nanban Ventures' purported size and AUM:

a.    On December 2, 2020, during a Better Wealth Podcast titled *Making a Killing With Index, Options, and The Asset with CEO of Nanban Investments* that was posted and remains posted on YouTube, Krishnan nodded in agreement when asked by the interviewer, "within less than a year, you guys have raised over $950 million?"

b.    In February 2021, during a YouTube video titled *How GK financial strategy won more than 25,000 people's confidence?* that was posted a year after the Nanban financial organization came into existence, Krishnan represented that Nanban was "almost a $1.2 billion company."

c.    In an undated interview posted on the Investment Fund Secrets (IFS) "Fund Launch" website and titled *Investment Fund Secrets*, Krishnan represented that "[w]e have gone from zero to $2.5 billion in 17 months."

d.    On October 19, 2022, during an IBC Tamil TV interview titled *Global Summit of Tamil Entrepreneurs & Professionals – Mr. Nanban GK Interview* that was posted and remains available on YouTube, Krishnan represented that "all the six divisions that we have is worth INR 96,000 crores [960,000,000,000 Indian Rupees] ($11.5 billion)."

108.    These statements are false and misleading.  At the times that the statements were made, the Nanban-related companies never had more than $130 million in AUM.  On some of

the dates that the statements were made, the AUM was significantly less.  Krishnan knew, or was severely reckless in not knowing, that the statements were false, because he had direct knowledge of the actual size of the assets he managed.  The misstatements identified in paragraph 107 above were material, because a reasonable investor would find it important in making an investment decision to know that his or her investment adviser was grossly overstating the size, success, and bona fides of its business.

## I.    Defendants Are Engaged in an Ongoing Fraud

### a.  Ongoing Offerings

109.    Defendants continue to offer and sell securities.  In 2023, the Founders sought to expand their operations globally and began soliciting international investors from the United Kingdom, Singapore, India, and the Gulf region to invest in the VC Funds.  As recently as July 2023, Nanban Ventures launched a new venture capital fund called the Eco Harmony Fund LP.  Upon information and belief, that offering is ongoing.

110.    At least as late as July 2023, Nanban Ventures continued to solicit current fund investors by offering them the option to reinvest purported profit distributions in the VC Funds or to make additional "top off" investments to buy additional units in the VC Funds.  Further, a Note Investor deposit and a VC Fund Investor deposit was made at least as recently as July 12, 2023 and July 14, 2023, respectfully.

### b.  The Compliance Email and Acknowledgement Form

111.    During the SEC's investigation that preceded the filing of this action, Defendants learned that the SEC had discovered that (a) the so-called "fintech" companies were not fintech companies and were related-party companies disguised as third-party companies, and (b) Defendants used the Related Party Notes to create the false appearance of investment profit.

112.    Thereafter, on or about August 9, 2023, Nanban Ventures emailed all VC Fund Investors ("Compliance Email").   The Compliance Email states that a forthcoming acknowledgment form ("Acknowledgement Form") was part of a "formal compliance process, [] to ensure that all [VC Fund] investors have a clear understanding of how earnings are derived."

113.    The Acknowledgement Form purports to require investors to affirm that Nanban Ventures previously disclosed to them that the Founders owned and controlled the so-called fintech companies, which the VC Funds purportedly invested in "through debt notes to portfolio companies to generate minimum interest/return of 18% per year on a best effort basis [and] [u]sing proprietary cash flow strategies on market indices and bonds, Nanban Ventures invests through these companies (Centum FinTech LLC, Himalayan FinTech LLC and Sunshine FinTech LLC etc.) to provide semi-annual non-guaranteed earnings."

114.    The Compliance Email and the Acknowledgement Form are false and misleading and are more deceptive acts in furtherance of Defendants' ongoing scheme to defraud. Defendants did not disclose the Founders' control of the Founder Companies, the Related Party Notes, or the loan terms when the VC Fund Investors invested or reinvested in the VC Funds and, if at all, only after Defendants became aware of the SEC raising this issue during its investigation.

115.    The Acknowledgement Form also contains misrepresentations and omissions about the so-called loan investments.  The Acknowledgement Form:

    a.    falsely claims that the notes have *minimum* interest of 18%, when in fact interest is capped at a stated percentage;

    b.    states that interest on the notes will only be paid on a "best effort basis," when the face of the notes had no such qualification;

      c.      fails to disclose the trading losses that the Founder Companies have incurred from GK Strategies trading.

116.    Defendants knew that these disclosures were not previously made in the manner represented in the Acknowledgement Form.  In fact, Krishnan has previously admitted under oath that investors were not aware of the loans or their terms.  Defendants are using the Compliance Email and Acknowledgement Form as deceptive devices, are falsely leading investors to believe they must sign the letter or potentially risk their investment, and are potentially causing investors to unknowingly comprise claims.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Exchange Act**
**Exchange Act Section 10(b) and Rule 10b-5 thereunder**

***Against all Defendants***

117.    The SEC incorporates by reference each and every allegation contained in paragraphs 116 above.

118.    By engaging in the conduct alleged above, Krishnan, Shanmugam, Gounder, Nanban Ventures, GSM, Centum, and Himalayan, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

      a.      employed a device, scheme, or artifice to defraud; and/or

      b.      made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.      engaged in an act, practice, or course of business which operated or would

operate as a fraud or deceit upon any person.

119.    By reason of the foregoing, Krishnan, Shanmugam, Gounder, Nanban Ventures,

GSM, Centum, and Himalayan have violated, and unless enjoined will continue to violate,

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §

240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Securities Act
### Securities Act Section 17(a)

#### *Against all Defendants*

120.    The SEC incorporates by reference each and every allegation contained in

paragraphs 116 above.

121.    By engaging in the conduct alleged above, Krishnan, Shanmugam, Gounder,

Nanban Ventures, GSM, Centum, and Himalayan directly or indirectly, in the offer or sale of

securities, by the use of the means or instruments of transportation or communication in

interstate commerce or by use of the mails, have:

a.      knowingly or with severe recklessness employed a device, scheme, or

artifice to defraud; and/or

b.      knowingly, recklessly, or negligently obtained money or property by

means of an untrue statement of a material fact or an omission to state a

material fact necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; and/or

c.      knowingly, recklessly, or negligently engaged in a transaction, practice, or

course of business which operated or would operate as a fraud or deceit

upon the purchaser.

122.    By reason of the foregoing, Krishnan, Shanmugam, Gounder, Nanban Ventures,

GSM, Centum, and Himalayan have violated, and unless enjoined will continue to violate,

Section 17(a) of the Securities Act [15 U.S.C. § 77q].

## THIRD CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Advisers Act
### Advisers Act Sections 206(1) and (2)

*Against Defendants Krishnan, Shanmugam, Gounder, and Nanban Ventures*

123.    The SEC incorporates by reference each and every allegation contained in

paragraphs 116 above.

124.    By engaging in the conduct alleged above, Krishnan, Shanmugam, Gounder, and

Nanban Ventures, directly or indirectly, by the use of the mails or any means or instrumentality

of interstate commerce, while acting as investment advisers within the meaning of Section

202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], have: (a) employed a device, scheme,

or artifice to defraud a client or prospective client; and/or (b) engaged in a transaction, practice,

or course of business which operated as a fraud or deceit upon a client or prospective client.

125.    With regard to the violations of Section 206(1) of the Advisers Act, Krishnan,

Shanmugam, Gounder, and Nanban Ventures engaged in the conduct intentionally or with severe

recklessness.  With regard to the violations of Section 206(2), Defendants Krishnan,

Shanmugam, Gounder, and Nanban Ventures engaged in the conduct at least negligently.

126.    By reason of the foregoing, Krishnan, Shanmugam, Gounder, and Nanban Ventures have violated, and unless enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

### FOURTH CLAIM FOR RELIEF

#### Violations of Section 206(3) of the Advisers Act

*Against Defendants Krishnan, Shanmugam, Gounder, and Nanban Ventures*

127.    The SEC incorporates by reference each and every allegation contained in paragraphs 116 above.

128.    By engaging in the conduct alleged above, Krishnan, Shanmugam, Gounder, and Nanban Ventures, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, while acting as investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], each acted as principal for its/his own account, knowingly to sell securities (promissory notes) to or purchase securities from clients— or knowingly to effect sales or purchases of securities for the account(s) of such client, without disclosing to such clients in writing before the completion of such transactions the capacities in which they were acting and obtaining the consent of the clients to such transactions.

129.    By reason of the foregoing, Krishnan, Shanmugam, Gounder, and Nanban Ventures have violated, and unless enjoined will continue to violate, Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

### FIFTH CLAIM FOR RELIEF

#### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder
#### *Against Defendants Krishnan, Shanmugam, Gounder, and Nanban Ventures*

130.    The SEC incorporates by reference each and every allegation contained in paragraphs 116 above.

131.    By engaging in the conduct alleged above, Krishnan, Shanmugam, Gounder, and Nanban Ventures, directly or indirectly, through the use of the mails or any means or instrumentality of interstate commerce, while acting as investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], engaged in an act, practice, or course of business that was fraudulent, deceptive, or manipulative.

132.    The VC Funds are "pooled investment vehicles" as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

133.    While acting as investment advisers to the VC Funds, Krishnan, Shanmugam, Gounder, and Nanban Ventures: (a) made an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to an investor or prospective investor in the Fund; and/or (b) engaged in an act, practice, or course of business that was fraudulent, deceptive, or manipulative with respect to an investor or prospective investor in the Fund.

134.    As a result, Krishnan, Shanmugam, Gounder, and Nanban Ventures have violated, and unless enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## VI.  JURY TRIAL DEMAND

The SEC demands a trial by jury on all issues that may be so tried.

## VII.  RELIEF REQUESTED

Therefore, the SEC respectfully requests that this Court:

(a)    Permanently enjoin all Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(b)      Permanently enjoin Krishnan, Shanmugam, Gounder, and Nanban Ventures from violating Sections 206(1), (2), (3), and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

(c)      Permanently enjoin all Defendants from participating in the issuance, purchase, offer, or sale of any security, whether directly or indirectly, including, but not limited to, through any entity owned or controlled by them, provided, however, that such injunctions shall not prevent each of Krishnan, Shanmugam, and Gounder from purchasing or selling securities for his own personal accounts;

(d)      Order, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], that Krishnan, Shanmugam, and Gounder be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

(e)      Order Defendants to disgorge all ill-gotten gains obtained as a result of the conduct described herein, plus prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

(f)      Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and, with respect to Krishnan, Shanmugam, Gounder, and Nanban Ventures, Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

(g)      Grant such further relief as this Court may deem just and proper.

Dated: October 5, 2023

Respectfully submitted,

/s/ *Keefe Bernstein*
Keefe Bernstein
Texas Bar No. 24006839
(817) 900-2607
bernsteink@sec.gov

Jason P. Reinsch
Texas Bar No. 24040120
Direct Phone:  (817) 900-2601
reinschj@sec.gov

Samantha Martin
Texas Bar No. 24065090
(817) 978-5035
martins@sec.gov

Clemon Ashley
Illinois Bar No. 6294839
(817) 900-2627
ashleyc@sec.gov

Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, TX 76102

Counsel for Plaintiff
Securities and Exchange Commission

## **L.R. CV-5(a)(7) Certification**

In accordance with L.R. CV-5(a)(7), I certify that a Motion to Seal the forgoing document has been filed.

/s/ Keefe Bernstein
Keefe Bernstein