UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION | § | |
| | § | |
| Plaintiff, | § | |
| | § | **FILED UNDER SEAL** |
| V . | § | |
| | § | **C.A. NO.: 4:23-cv-00885-SDJ** |
| GOPALA KRISHNAN, MANIVANNAN | § | |
| SHANMUGAM, SAKTHIVEL PALANI | § | **JURY TRIAL DEMANDED** |
| GOUNDER, NANBAN VENTURES LLC, | § | |
| GSM ETERNAL LLC (A/K/A NORTHSTARS | § | |
| FINTECH), HIMALAYAN FINTECH LLC, | § | |
| AND CENTUM FINTECH LLC (A/K/A | § | |
| SUNSHINES FINTECH), | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against

Defendants Gopala Krishnan ("Krishnan"), Manivannan Shanmugam ("Shanmugam"),

Sakthivel Palani Gounder ("Gounder"), Nanban Ventures LLC ("Nanban Ventures"), GSM

Eternal LLC, a/k/a NorthStar's FinTech ("GSM"), Himalayan Fintech LLC, ("Himalayan"),

and Centum FinTech LLC, a/k/a Sunshine FinTech ("Centum") (collectively, "Defendants").

## I.   SUMMARY OF THE ACTION

1.**Paragraph 1** - Defendants object to the phrases "fraudulent securities offering" as a

conclusory and inflammatory statement. Defendants deny 'targeting members of the Indian (or

any) community. Defendants deny the accuracy of the dollar figures referenced of "$89.8"

million and "$39.9" million and "129.7" million. Defendants GSM Eternal, LLC a/k/a

Northstars Fintech ("GSM"), Himalayan Fintech, LLC ("Himalayan") and Centum Fintech

LLC a/k/a Sunshines Fintech ("Centum") (referred to by the SEC as the "Founder Companies") deny that the loans made directly with them (referred to as "high-yield promissory notes" by the SEC) are securities at all. Defendants admit to having approximately 360 investors in the VC funds. Defendants admit that they raised money in five (5) VC Funds which all have the name "Nanban" as part of their name. Defendants admit that a majority of the investments made in the VC funds and the loans made directly to the Founder Companies are investments/loans with a majority of (supportive) friends and family or friends of friends and family. Subject to the foregoing objections, denials and admitted statements, the Defendants deny the remainder of paragraph 1.

2.      **Paragraph 2.** Defendants deny the entirety of paragraph 2. Defendants object to the term "ponzi payments" "fraudulent enterprise" "overstating the profitability" and "fake profits" as conclusory and inflammatory statements. Defendants deny "paying investors and themselves … using … investor funds." Defendants admit that they properly paid interest payments as detailed in the various relevant documents which were generated by operating three entities - GSM, Himalayan, and Centum ("Founder Companies") and investments made through Solid Assets LLC, which the SEC has already admitted (oddly somewhat begrudgingly for a governmental entity which the American public understands to have the purpose of "dispensing justice" rather than advocating for the downfall of an American entrepreneur) that "the Founders likely used the money deployed to Solid SPV and Unicorn SPV for their intended purpose." (TRO Application, Exh. 1, Aff. of L. Bennett paragraph 33). The Defendants note that the Founder Companies are not fund companies but are

operating companies. And, Defendants further note that of the three main vehicles used to diversify the portfolios of the VC Funds (Nanban Ventures Intangibles, LLC, Solid Assets, LLC and Nanban Ventures Unicorn, LLC) the SEC has found no issues with ⅔ of the Nanban companies. And the SEC, oddly, did not reference at all in the complaint the vast assets held in the remaining company that *is* currently at issue in this case (Nanban Ventures Intangibles, LLC and the Founder Companies located below it in the corporate structure). Again, the Defendants sincerely hope this was due to an oversight rather than the SEC's investigator's desire to abandon its stated duty of protecting the public in their need to justify the investigation.

3.      **Paragraph 3, sentence 1.** To raise investor funds in the first instance, Defendants made multiple misrepresentations and omissions to investors.

Defendants object to the phrase "to raise investor funds in the first instance" as vague and ambiguous. Defendants are not sure what the SEC is referencing. If the SEC is referencing the Defendants' early hedge fund attempts, Defendants state that any statements made by Defendants were accurate. Defendants deny making misrepresentations (including "multiple misrepresentations") or any omissions of material fact.

**Paragraph 3, sentence 2.** Defendants deny paragraph 3, sentence 2 is a mischaracterization of the evidence. Specifically, Defendants did not "tell the fund and note investors that they would invest their money using [SOLELY] "GK Strategies." (Which appears to the be SEC's interpretation.) Defendants admit that using GK Strategies is a

portion of their overall diversified portfolio created for their VC investors.  Defendants assert that GK Strategies DID and DOES outperform the S&P 500 index from a cash flow analysis because the S&P 500 Index is merely an asset that will increase or decrease in value over the quantity of time it is held. GK Strategies takes that asset and uses it to create cash flow. So, the basic GK Strategies question is which is better: (1) hold on to your one (or more) share(s) of S&P 500 index for next 30 years in your 401K and sell it at the end of that period (the "set it and forget it" approach) or (2) do you take the GK Strategies two-fold approach of holding the index but then using an  options/call method taught by GK Strategies to make the asset work for you in cash flow over the life of the hold on the index. It defies common sense to ever think that option 1 is better than option 2. Thus, the statement that option 2 will outperform the old "set it and forget it" strategy is clearly not a misrepresentation of the performance of GK Strategies.

To be clear, Defendants further deny that they ever told the VC fund investors that they would "invest their money using GK Strategies." The VC fund PPMs all clearly state that "proprietary strategies" would be used. GK Strategies is a portion of those proprietary strategies, but not the entirety of the substantially diversified portfolio that the Nanban entities have created for their investors. Attempts to fold one strategy into the other are logically incorrect. It is also important to note Defendants always maintained that returns were based on the CASH FLOW generated from the strategies. GK strategies uses existing options framework to define a set of steps to execute with clear ENTRY and EXIT criteria to

generate CASH FLOW. The defendants never intended to use PROFITS as a metric to discuss with any investors.

Defendants deny any "gross misrepresentation(s)," deny that they told investors they would "never lose money." It appears that the SEC is interpreting the outperformance comments to mean that the asset itself would never decrease in value. Defendants have always maintained that the value of the asset during its use as a cash flow strategy is somewhat irrelevant. The only thing that matters is that, unless the stock market crashes entirely (as in it completely ceases to exist), the S&P 500 Index will always be an asset and thus can be utilized to generate cash flow. Whether that index is worth $50,000 today, $75,000 tomorrow or $25,000 the following day or $100,000 the day after is irrelevant to the GK Strategies method. The asset will still produce cash flow using the GK Strategies (which is what was represented to investors). And, with the substantial diversity the Nanban entities have provided to the VC Fund investors through its diversification into bonds, real estate, start-up companies and others, it is clear that the Defendants are delivering on their promises (which is further evidenced by the fact that the investors have all received their interest payments pursuant to the document terms). Defendants deny the term "note investors" as a legal conclusion and a misnomer for the lenders who loaned money directly to the Founder Companies in exchange for a set 18% interest payment. Defendant Krishnan admits his nickname is GK.

4.    **Paragraph 4, sentence 1.** Defendants deny "misrepresent[ing] the funds'

investments" or "concealing conflicts of interest." Defendants believe that they adequately disclosed their business model and sought advice of counsel regarding said disclosures.

**Paragraph 4, sentence 2.** Defendants told investors that the funds would trade using GK Strategies and also invest in start-up technology companies and real estate. Deny. Defendants told investors that the funds would be invested in "proprietary strategies." those strategies did include investments in bond trading company, real estate, start-up companies (some technology-related, some not) and brokerage account using the GK Strategies cash flow method.

**Paragraph 4, sentence 3.** Nanban Ventures then provided fund investors a statement of investments purporting to show that most of the funds' assets were invested in three "fintech" companies. Defendants admit to providing VC fund investors with a statement of investments. Defendants admit to showing where the funds' assets were invested, which included three GSM, Himalayan and Centum entities. Defendants admit that the term "Fintech was their version of a short form of "Financial Techniques". Defendants admit that the fintech companies have invested the capital across a wide range of assets and that the total fair market value of the assets is much higher than the liabilities or even the capital generated from the combination of the VC Funds and the loans.

**Paragraph 4, sentence 4.** "Fintech" refers to companies that use technology to improve financial services. Defendants deny knowing (then or now) that there is any requirement that they could not use the term "fintech" in their Founder Company entities.

**Paragraph 4, sentence 5.** But here, the so called "fintech" companies were actually the Founder Companies, which are simply other "Nanban" companies that the Founders control and disguised to appear as third-party fintech companies. Defendants deny that they "disguised" the control or management of the Fintech companies. Defendants assert that control or management of the Fintech companies was disclosed to the VC Fund investors. It was not material to the investors due to the structure of the VC Fund investments and business model of the founder companies.

5.      **Paragraph 5, sentence 1.** In fact, Nanban Ventures and the Founders did not invest the majority of the funds' assets as represented. Defendants deny that they "did not invest the majority of the funds' assets as represented."

**Paragraph 5, sentence 2.** Instead, they purportedly invested most of the assets in unsecured promissory notes issued by the related-party Founder Companies – companies that are not engaged in fintech business and have little or no assets other than investor funds or assets purchased with investor funds. Defendants object to paragraph 5, sentence 2 as mischaracterizing the status of the promissory notes, and is factually incorrect as to the assets held by the Founder companies. Defendants assert that the Founder companies have invested the VC Investor Funds across a wide range of assets. The total fair market value of the assets is much higher than the liabilities or even the capital generated from the combination of the VC Funds and the loans.

6.      **Paragraph 6, sentence 1.** Nanban Ventures and the Founders also acted as

investment advisers to the funds, and, therefore, owed a fiduciary duty to the funds. Defendants Krishnan, Gounder, Shanmugam, GSM Eternal, LLC, Himalayan Fintech LLC and Centum Fintech LLC deny that they acted as investment advisors to the funds and deny owing a fiduciary duty to the funds. Defendant Nanban Ventures, LLC admits to acting as an investment advisor to the funds and owing a fiduciary duty to the funds.

**Paragraph 6, sentence 2.** They blatantly breached this duty by putting the Founders' interests ahead of the funds' interests, engaging in and profiting from undisclosed conflicts of interest, and misusing fund assets in a manner that was inconsistent with the fund documents, including by entering into the related-party notes and taking excess compensation. Defendants deny all allegations made in paragraph 6, sentence 2.

7.    **Paragraph 7, sentence 1.** By their misconduct, Defendants violated the antifraud provisions of the federal securities laws. To the extent any response is required to paragraph 7, sentence 2, Defendants deny the allegations therein.

**Paragraph 7, sentence 2.** The SEC brings this action seeking injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, civil penalties, officer and director bars, and all other equitable and ancillary relief the Court deems just and proper. To the extent any response is required to paragraph 7, sentence 2, Defendants deny the allegations therein.

## II.    <u>JURISDICTION AND VENUE</u>

8.    **Paragraph 8.** Defendants admit the jurisdictional allegations in paragraph 8.

9.    **Paragraph 9.** The limited-partnership units and investment notes offered,

purchased, and sold, as alleged herein, are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c]. Defendants admit that the VC Funds Limited partnership units issued to investors are securities. Defendants deny that the loans to the Founder Companies are securities.

10.    **Paragraph 10.** Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and the mails in connection with the transactions, acts, practices, and/or courses of business alleged herein. Defendants neither admit nor deny the statements made in paragraph 10 as it is just a regurgitation of the statute.

11.    **Paragraph 11, sentence 1.** Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district. Defendants also reside and transact business in this district. Defendants admit to the venue being proper. Defendants deny any violation of the federal securities laws.

### III.    <u>DEFENDANTS</u>

12.    **Paragraph 12.** Defendant Krishnan is an individual residing in Frisco, Texas. Defendant Krishnan admits the statements in paragraph 12.

13.    **Paragraph 13.** Defendant Shanmugam is an individual residing in Frisco, Texas. Defendant Shanmugam admits the statements in paragraph 13.

14.     **Paragraph 14.** Defendant Gounder is an individual residing in Frisco, Texas. Defendant Gounder admits the statements in paragraph 14.

15.     **Paragraph 15, sentence 1.** Defendant Nanban Ventures is a Texas limited liability company with its principal place of business in Plano, Texas. Defendants admit the statements in paragraph 15, sentence 1.

**Paragraph 15, sentence 2.** The Founders own and control Nanban Ventures through intermediary entities, with Krishnan owning 42.5%, Gounder owning 21.25%, Shanmugam owning 21.25%, and an additional partner owing 15%. Defendants admit the statements in paragraph 15, sentence 2.

16.     **Paragraph 16, sentence 1.** Defendant GSM is a Texas limited liability company with its principal place of business in Plano, Texas. Defendants admit the statements in paragraph 16, sentence 1.

**Paragraph 16, sentence 2.** The Founders own and control GSM through intermediary entities, with Krishnan owning 50%, Gounder owning 25%, and Shanmugam owning 25%. Defendants admit the statements in paragraph 16, sentence 2.

**Paragraph 16, sentence 3.** The Founders are signatories to GSM's bank accounts and have access to its brokerage accounts. Defendants admit the statements in paragraph 16, sentence 3.

17.     **Paragraph 17, sentence 1.** Defendant Himalayan is a Texas limited liability company with its principal place of business in Plano, Texas.  Defendants admit the statements in paragraph 17, sentence 1.

**Paragraph 17, sentence 2.** The Founders control and, upon information and belief, own Himalayan through intermediary entities, with Krishnan owning 50%, Gounder owning 25%, and Shanmugam owning 25%. Defendants admit the statements in paragraph 17, sentence 2.

**Paragraph 17, sentence 3.** The Founders are signatories to Himalayan's bank accounts. Defendants admit the statements in paragraph 17, sentence 3.

18. **Paragraph 18, sentence 1.** Defendant Centum is a Texas limited liability company with its principal place of business in Plano, Texas. Defendants admit the statements in paragraph 18, sentence 1.

**Paragraph 18, sentence 2.** The Founders own and control Centum through intermediary entities, with Krishnan owning 50%, Gounder owning 25%, and Shanmugam owning 25%. Defendants admit the statements in paragraph 18, sentence 2.

**Paragraph 18, sentence 3.** The Founders are signatories to Centum's bank accounts and have access to its brokerage accounts. Defendants admit the statements in paragraph 18, sentence 3.

## IV.   FACTUAL ALLEGATIONS

**A.   Origin of the Nanban Entities and GK Strategies**

19. **Paragraph 19.** "Nanban" is a Tamil word meaning "friend." Defendants admit the statements in paragraph 19.

20. **Paragraph 20, sentence 1.** In or around 2020, the Founders began using

various "Nanban" branded entities to promote what they claim is a propriety and purportedly highly successful options trading system called "GK Strategies."   Defendants deny the promotion of "GK Strategies" through any of the Nanban for profit entities.

**Paragraph 20, sentence 2.** According to Krishnan, who goes by "GK," GK Strategies encompasses five levels of increasingly complex trading methods. Defendants admit the statements in paragraph 20, sentence 2.

**Paragraph 20, sentence 3.** Krishnan dubbed these various levels as "GK Strategies Level One," "GK Strategies Level Two," *et seq*. Defendants admit the statements in paragraph 20, sentence 3.

21.   **Paragraph 21, sentence 1.** Krishnan and the other Founders had careers in the IT industry. Defendants admit their background was in the IT industry.

**Paragraph 21, sentence 2.** They have little or no experience or training in the investment industry. Defendant Krishnan denies having "little or no experience or training in the investment industry. Defendants Gounder and Shanmugam deny having "little or no training in the investment industry." The Defendant companies are without sufficient information to admit or deny the allegation in paragraph 21, sentence 2.

22.   **Paragraph 22, sentence 1.** Before 2020, Krishnan primarily offered his GK Strategies to friends and family on an ad hoc basis. Defendant Krishnan admits the statements in paragraph 22, sentence 1.

**Paragraph 22, sentence 2.** In the spring or early summer of 2020, the Founders

launched the first of several for-profit hedge funds to employ GK Strategies. Defendants admit the statements in paragraph 22, sentence 2, with the exception that the first hedge fund was started in June 2020.

23.     **Paragraph 23, sentence 1.** In July 2020, the Founders founded the Nanban Foundation, with the purported charitable purpose of helping "Nanbans" achieve financial freedom by teaching GK Strategies Levels One and Two. Defendants object to the work "purported" as inflammatory and conclusory. Defendants partially admit the statements in paragraph 23, sentence 1, with the exception that the paperwork for Nanban Foundation started in April or May 2020, and there was a foundation by the name Nanban Investments Foundation prior to this date and it was closed after launching Nanban Foundation. Defendants admit to helping thousands of Nanbans learn the cash flow model.

24.     **Paragraph 24, sentence 1.** However, the Nanban Foundation's primary purpose was to recruit potential investors for the hedge funds. Defendants deny the statements in paragraph 24, sentence 1.

**Paragraph 24, sentence 2.** Through word-of-mouth in the DFW-area Indian community, as well as Krishnan's YouTube videos touting his purported successes using GK Strategies, prospective investors connected with the Nanban Foundation. Defendants object to the allegations in paragraph 24, sentence 2 as speculative. Defendants deny the statements in paragraph 24, sentence 2 to the extent possible.

25.     **Paragraph 25, sentence 1.** The Nanban Foundation offered prospective investors free webinars where they could learn GK Strategies Levels One and Two.

Defendants object to the phrase "prospective investors" as a mischaracterization of evidence. Defendants admit that the Nanban Foundation offered webinars to learn financial cash flow strategies (referred to as GK Strategies Levels One and Two) free of charge to all interested. Nanban Foundation did not and does not consider these individuals "prospective investors."

**Paragraph 25, sentence 2.** However, prospective investors were told that they would have to invest in Nanban's hedge funds if they wanted to maximize their returns using GK Strategies Levels Three through Five. Defendants deny the statements in paragraph 25, sentence 2 to the extent possible.

26.    **Paragraph 26, sentence 1.** From 2020 until approximately September 2021, the Founders raised approximately $116.5 million from approximately 395 investors for four successive hedge funds. Defendants admit this approximate numbers within this period

**Paragraph 26, sentence 2.** All four hedge funds underperformed the S&P 500 Index. Defendants deny that the hedge funds "underperformed the S&P 500 Index." Again, the SEC is switching financial metrics used to compare the cash flow strategies used by GK Strategies in the hedge funds with a profit or asset valuation metric. Defendants incorporate their more thorough response articulating GK Strategies in response to Paragraph 3, sentence 2, above. Hedge funds performance against S&P 500 index is not material as all funds returned profits as per the investment thesis in their PPM.

**Paragraph 26, sentence 3.** The last two hedge funds realized annual returns that significantly underperformed the S&P 500 index. Hedge funds performance against S&P 500 index is not material as all funds returned profits as per the investment thesis in their PPM.

Defendants again deny that the hedge funds "underperformed the S&P 500 Index." Sentence 3 is a continued example of the SEC switching financial metrics used to compare the cash flow strategies used by GK Strategies in the hedge funds with a profit or asset valuation metric. Defendants did not articulate "annual returns" in the form of profits, rather Defendants discussed "returns" in the form of cash flow. Defendants incorporate their more thorough response articulating GK Strategies in response to Paragraph 3, sentence 2, above.  Defendants admit that from a cash flow perspective, all hedge funds overperformed the S&P 500, but Defendants recognize that from a profits perspective (WHICH WAS NOT A PERFORMANCE METRIC USED BY DEFENDANTS) the last three hedge funds underperformed the S&P 500 index in profit. Defendants admit that the first two hedge funds overperformed the S&P 500 in both a cash flow (which was the intent) and a profit perspective (which was not the intent, but good for everyone).

27.     **Paragraph 27, sentence 1.** Due to the poor performance of the last two hedge funds, many investors complained about the returns and requested their money back. Defendants deny that "many" investors complained about the hedge fund. Defendants admit that some investors requested their money back for a variety of reasons.

28.     **Paragraph 27, sentence 2.** The Founders closed the last two hedge funds as a result of the redemption requests and returned the hedge fund investors' original capital, along with a small purported profit. Defendants admit that they closed the last two hedge funds earlier than scheduled. Defendants deny the closing was as a result of investor complaints or redemption requests.  Defendants admit that the last two funds were closed due

to concerns about exposure of the company's proprietary strategies (the "secret sauce"), quarterly accounting issues and other operational challenges. Defendants admit that all hedge fund investors had their capital returned plus interest.

29.     **Paragraph 28, sentence 1.** Unbeknown to investors, these payments to the hedge fund investors were sourced, at least in part, from a commingled bank account containing money from other, subsequent investors, as alleged further below. Defendants deny the allegations in paragraph 28, sentence 1 in their entirety. Defendants deny allegations of commingling. Defendants admit that money was held in appropriate bank accounts with all appropriate required accounting performed to maintain records related to each investor. Defendants admit that the hedge fund investors payments were sourced, in part from profits generated by founder company operations.

**Paragraph 29, sentence 1.** The Founders claim that they have relinquished control of the Nanban Foundation to their wives, who are members of Nanban Foundation's board of directors. Defendants Krishnan, Gounder and Shanmugam admit that they were the board of directors of Nanban Investment Foundation and the operations have ceased at the foundation. Defendants Krishnan, Gounder and Shanmugam admit that their wives are on the Nanban Foundation Board of Directors.

**B.     Nanban Ventures and the VC Funds**

30.     **Paragraph 30, sentence 1.** In March 2021, the Founders formed Nanban Ventures. Defendants admit they formed Nanban Ventures in March 2021.

31.     Nanban Ventures, as alleged in more detail below, is an unregistered investment adviser firm that the Founders and a fourth partner own, manage, and control. Defendants admit that Nanban Ventures is not registered because Defendants were informed by legal counsel that since the AUM has been less than $150M, full registration was not required. Currently Nanban Ventures is an SEC Exempt Reporting Advisor.

**31.     Paragraph 31, sentence 1.** When investors became dissatisfied with the performance of the hedge funds, the Founders pivoted from the hedge funds to so-called venture capital funds ("VC Funds"). Defendants deny the allegations in paragraph 31, sentence 1.

**Paragraph 31, sentence 2.** The VC Funds are private investment funds. Defendants admit the statement in paragraph 31, sentence 2.

**32.     Paragraph 32, sentence 1.** Unlike the hedge funds, Krishnan and other Nanban representatives told investors that the VC Funds would generate returns for investors from other investments beyond GK Strategies. Defendants admit the allegations in paragraph 32, sentence 1.

**Paragraph 32, sentence 3.** The VC Funds would: (1) engage in trading using GK Strategies; (2) invest in startup companies, primarily in the technology sector; and (3) make real estate investments. Defendants Deny VC Fund allegations in paragraph 31, sentence 3 that VC fund will engage in trading using GK Strategies however VC funds would invest in operating companies which utilizes proprietary strategies including GK Strategies. Defendants admit VC Fund would invest in startup companies, primarily in the technology sector and make

real estate investments.

   **33.**     **Paragraph 33, sentence 1.** From approximately May 2021 to July 2023, the

Founders, acting through Nanban Ventures, raised approximately $89.8 million from over 350

investors ("VC Fund Investors") in multiple states by selling limited partnership units in five

VC Funds. The following chart summarizes the offerings:

| VC Fund | Raise Period | Investors | Amount Raised |
|---------|-------------|-----------|---------------|
| Capital | May 11, 2021 – July 18, 2023 | 105 | $25,509,592 |
| AAA | Sept. 17, 2021 – July 18, 2023 | 99 | $5,426,494 |
| Ganga | Dec. 10, 2021– July 18, 2023 | 95 | $19,280,193 |
| Abundance | Dec. 27, 2021 – July 18, 2023 | 6 | $23,325,000 |
| Nile | Aug. 26, 2022 – July 18, 2023 | 81 | $16,266,872 |
| **Total Raised:** | | | **$89,808,151** |

   Defendants  generally  admit  the  statements  except  for  the  accuracy  of  the  "$89.8

Million."

   **34.**     **Paragraph 34, sentence 1.** The  VC  Fund  Investors  were  also  offered  the

opportunity to either receive purported profit distributions or reinvest their purported profit

distributions back into the VC Funds. Defendants object to the term "purported" as conclusory

and inflammatory. Defendants admit that the VC Fund Investors were offered the opportunity

to either receive distributions or reinvest their distributions back into the VC Funds.

   **Paragraph 34, sentence 2.** Most investors choose to reinvest their purported profits.

Defendants object to the term "purported" as conclusory and inflammatory. Defendants admit that the VC Fund Investors purchased additional units in the VC Funds by reinvesting their distributions.

35.     **Paragraph 35, sentence 1.** Through at least July 2023, Nanban Ventures continued to solicit additional investments ("top off investments") from existing VC Fund Investors, whereby the investors could buy additional units to add to their existing VC Funds' investments. Defendants deny ever soliciting any investments, much less "additional investments." Defendants admit that VC Fund Investors were able to "top off" their investments at the investor's discretion.

36.     **Paragraph 36, sentence 1.** As with the hedge funds, Nanban Ventures obtained VC Fund investors, inter alia: (a) through referrals from the Nanban Foundation, and (b) when individuals were routed to Nanban Ventures after watching one of Krishnan's YouTube videos. Defendants deny the allegations in Paragraph 36.

**Paragraph 36, sentence 2.** Most of the VC Fund investors are retail investors that are members of the Indian community in the DFW-area or other parts of the United States. Defendants admit that the factual statements in paragraph 36, sentence 2 however defendants do not qualify their background before investing into the VC fund.

37.     **Paragraph 37, sentence 1.** Nanban Ventures is an unregistered investment adviser the Founders formed to raise money for, and provide investment advice to, the VC Funds. Defendants admit to the statements in paragraph 37, sentence 1.

**Paragraph 37, sentence 2.** Nanban Ventures' advisory clients are the VC Funds. Defendants admit to the statements in paragraph 37, sentence 2.

**Paragraph 37, sentence 3.** Similarly, the Founders and the new partner were the designated portfolio managers for the VC Funds, and they were the individuals who provided the investment advisory services to the VC Funds and selected the investments for the VC Funds. The Founders and the new partner met to discuss and evaluate the performance of the VC Funds and to make investment decisions for the funds. Defendants admit to the statements in paragraph 37, sentence 3.

38.     **Paragraph 38, sentence 1.** Nanban Ventures and each of the Founders provided investment advice to the VC Funds for compensation in the form of a 2% management fee based on the total Assets Under Management ("AUM"). Defendants deny that there was a 2% "management fee." Defendants admit that there was a 2% operational fee. Defendants Krishnan, Gounder and Shanmugam deny taking any compensation from the operational fee. Otherwise, the Defendants admit the remainder of paragraph 38, sentence 1.

**Paragraph 38, sentence 2.** Nanban Ventures and each of the Founders were each engaged in the business of advising the VC Funds as to the advisability of investing in, purchasing, or selling securities, including when it directed the VC Funds to obtain equity investments in start-up companies and to purchase the Related Party Notes (defined and described below). Defendants Krishnan, Gounder and Shanmugam deny that they were "each engaged in the business of advising the VC Funds as to the advisability of investing in,

purchasing, or selling securities." Defendants Krishnan, Gounder and Shanmugam admit to performing due diligence and investigation into appropriate investments, including real estate, bonds, cash flow strategies and start-up companies as per their officer positions. Defendants object to the term "related party notes" as vague and ambiguous and potentially a mischaracterization of the loan documents.

40.     **Paragraph 39, sentence 1.** Krishnan's investment advice primarily focused on advising the VC Funds regarding trading using GK Strategies, with Shanmugam and Gounder also advising in this regard. Defendants deny the statements in paragraph 39, sentence 1 to the extent that it limits the investment strategy to just GK Strategies. The VC Funds used proprietary strategies that involved a diversified portfolio of stocks, bonds, cash flow strategies (GK Strategies), real estate, start-up companies and the opportunity to nimbly invest in other solid investments that presented themselves with a 5-10 year investment horizon.

**Paragraph 39, sentence 2.** Each of the Founders used VC Fund capital to trade using GK Strategies in GSM's brokerage accounts. Defendants admit that each of the founders, at one point, has used the GK Strategies in the two GSM Ameritrade brokerage accounts.

**Paragraph 39, sentence 3.** Shanmugam also advised the VC Funds about their real estate investments. Defendant Shanmugam admits he advised the VC Funds about real estate investments.

**Paragraph 39, sentence 4.** Gounder served as chief investment officer of Nanban Ventures and assisted in vetting start-up companies. Defendant Gounder admits he advised the VC

Funds about IT matters and vetting start-up companies.

**Paragraph 39, sentence 5.** The Founders also brought in a new partner to advise on the VC Funds' investments in start-up companies. Defendants admit that a fourth partner was brought in to head the start-up investment research arm of the diversified portfolio.

39.     **Paragraph 40, sentence 1.** The Founders also formed a separate management entity and a general partner entity for each fund (except the Capital Fund). Defendants deny a separate structure for the Capital Fund. Otherwise, the Defendants admit that a separate management entity and general partner entity exist for each fund.

**Paragraph 40, sentence 2.** For the Capital Fund, Nanban Ventures served as both the management entity and the general partner entity. The Defendants deny the statements made in paragraph 40, sentence 2.

**Paragraph 40, sentence 3.** The Founders manage and control the VC Funds' management entities and general partners. The Defendants admit the statements made in paragraph 40, sentence 3, except to clarify that the fourth partner manages the start-up arm of the portfolio.

41.     **Paragraph 41, sentence 1.** The VC Funds were required to pay their respective management entity a 2% AUM fee and to pay the general partner entity a share of any profits that exceeded 12-15%. Defendants deny that a management fee was charged. Defendants admit that an operation fee of 2% was paid to run the fund. Defendants Krishnan, Gounder and Shanmugam deny taking any compensation from the operational fee. Defendants admit that

the general partner receives a carried interest split which exceeds 12-15% on the distribution waterfall.

**Paragraph 41, sentence 2.** The source of compensation for the Founders and Nanban Ventures included advisory fees that the VC Funds paid for investment advisory services, namely, the 2% AUM fee, which the Founders and Nanban Ventures received directly or through the VC Funds' management entities. Defendants deny the statements made in paragraph 41, sentence 2.

## C.     The Note Investors

42.     **Paragraph 42, sentence 1.** In addition to promoting and soliciting investments in the VC Funds, the Founders also offered and sold high-yield promissory notes ("Investment Notes") to investors ("Note Investors"). Defendants deny "promoting or soliciting investments in the VC Funds." Defendants GSM, Himalayan and Centum admit to borrowing money from six (6) lender entities, but deny all characterizations of those loans as "offering and selling high-yield promissory notes". Defendants object to the  mischaracterization of those lenders as "Note Investors" or those loans as "Investment Notes."

**Paragraph 42, sentence 2.** One or more of these investors invested in the Investment Notes, because the investor did not want to participate in the VC Funds or the earlier hedge funds, but did want to make investment returns from GK Strategies. Defendants object to the statements in paragraph 42, sentence 2 as speculative and taken out of context. Defendants deny discussing with any of the lenders who loaned money to GSM, Himalayan

or Centum that they did so to "make investment returns from GK Strategies" and deny that was the purpose of the loans.

43.     **Paragraph 43, sentence 1.** The Founders sourced the Note Investors through their ties to the Indian business community, the Nanban Foundation, or through their previous careers in the IT sector. Defendants deny the characterization of the loans or lenders as "Note Investors." The defendants also deny soliciting or sourcing any of the loans. Defendants admit that the loans were from lenders they knew in the business community who wanted a fixed interest payment for those loans.

44.     **Paragraph 43, sentence 2.** Most of the Note Investors are high-net worth individuals in the Indian community or companies they control. Defendants deny the characterization of the loans or lenders as "Note Investors" or "Investment Notes." Defendants are without sufficient information to admit or deny the net-worth status of the lenders or the companies they control.

44.     **Paragraph 44, sentence 1.** Between April 16, 2021 and July 18, 2023, the Founders raised approximately $39.9 million in investments from approximately 10 Note Investors through at least 15 Investment Notes issued by the Founder Companies. Defendants deny the "$39.9 million" figure. Defendants continue to object to characterization of the loans or lenders as "Note Investors" or "Investment Notes." The Defendants otherwise admit to having approximately ten (10) loans made from Six (6) lenders issued to Defendants GSM, Himalayan or Centum.

45.     **Paragraph 45, sentence 1.** The Investment Notes obligated the issuing

Founder Company to make interest payments of 18% per year to the Note Investors, usually for a period of five years, in exchange for the principal investments. Defendants continue to object to characterization of the loans or lenders as "Note Investors" or "Investment Notes." Defendants otherwise admit to the terms of the loans.

46.     **Paragraph 46, sentence 1.** Krishnan told Note Investors that he would use GK Strategies or other "cash-flow" strategies to protect their principal while turning a profit.  Defendants continue to object to characterization of the loans or lenders as "Note Investors" or "Investment Notes." Defendant Krishnan denies telling (Lenders) "that he would use GK Strategies or other "cash-flow" strategies ONLY to protect their principal while turning a profit."

**Paragraph 46, sentence 2.** For example, in approximately the Spring of 2020, Krishnan told a Note Investor located in Texas that with GK Strategies, he could make 20-25% returns while never losing more than 1-2% of his invested capital. Defendants continue to object to characterization of the loans or lenders as "Note Investors" or "Investment Notes."  Defendant Krishnan admits that he believed and still believes that he can make 20-25% cash flow returns while never losing more than 1-2% of invested capital over a long term, but does not recall explaining that to any lender.

47.     **Paragraph 47, sentence 1.** As another example, in approximately the Spring of 2021, Krishnan told a Note Investor also located in Texas that his GK Strategies trading system earned investors annual returns of 20-40%. Defendants continue to object to characterization of the loans or lenders as "Note Investors" or "Investment Notes."

Defendant Krishnan admits that he believed and still believes that he can make 20-40% *cash flow* returns, but does not recall explaining that to any lender.

**Paragraph 47, sentence 2.** To avoid paying fees associated with investing in the VC Funds, Krishnan recommended that the Note Investor purchase an Investment Note to invest directly in GSM, which Krishnan represented made trades using GK Strategies. Defendant Krishnan denies this statement. Defendant Krishnan admits that the lender chose to loan money directly to GSM because the lender did not want the long term lock-in period and operation fee related to the VC Funds. That lender chose to loan money in exchange for the set 18% interest rate.

### D.    The VC Fund Units and the Investment Notes are Securities

48.    **Paragraph 48, sentence 1.** Section 2(a)(1) of the Securities Act and Section 3(a)(1) of the Exchange Act define "security to include, among other instruments, any "investment contract" or "note." Defendants neither admit nor deny the statements in paragraph 48 as they are just a statement of the statutory language.

49.    **Paragraph 49, sentence 1.** The limited-partnership units in the VC Funds are "investment contracts" under the Securities Act and the Exchange Act. Defendants object to this statement in paragraph 49, sentence 1 as a legal conclusion.

**Paragraph 49, sentence 2.** Investors invested their money to obtain an investment return and the funds were pooled with funds from other investors. Defendants object as speculation to the reasons "an investor invested their money." Defendants object to the use

of the world "pooled" as vague and ambiguous, and subject thereto, deny.

**Paragraph 49, sentence 3.** These were entirely passive investments, and investors had no role or say in the operations or management of the VC Funds or the underlying fund investments. Defendants admit that the VC Fund investor had no say in operations or management of the VC Funds or the underlying investments.

**Paragraph 49, sentence 4.** The VC Fund Investors were entirely dependent upon, and expecting to profit solely from, the Founders' expertise and efforts to manage the VC Funds and to select and manage the funds' underlying investments. Defendants admit the statements alleged in paragraph 49, sentence 4.

**Paragraph 49, sentence 5.** Moreover, the VC Fund's offering documents specifically identify the limited-partnership units as securities. Defendants state that the offering documents speak for themselves.

50. **Paragraph 50, sentence 1.** The Investment Notes are also securities under the Securities Act and the Exchange Act, which specifically include the term "notes" within the definition of securities. Defendants object to this statement in paragraph 50, sentence 1 as a legal conclusion and further deny this statement.

**Paragraph 50, sentence 2.** In addition, the Investment Notes are "investment contracts." Defendants object to this statement in paragraph 50, sentence 2 as a legal conclusion and further deny this statement.

**Paragraph 50, sentence 3.** Investors invested money to obtain fixed investment

returns of 18% per year, typically for a period of five years. Defendants object to this statement in paragraph 50, sentence 3 as a legal conclusion and further deny this statement.

**Paragraph 50, sentence 4.** The Note Investors' funds were pooled. Defendants object to this statement in paragraph 50, sentence 4 as a legal conclusion and further deny this statement.

**Paragraph 50, sentence 5.** The Investment Notes were entirely passive investments, and the Note Investors had no role or say in the operations or management of the Founder Companies. Defendants object to this statement in paragraph 50, sentence 5 as a legal conclusion and mischaracterization of the loans. Specifically, lenders are, as a common practice, not parties to operations or management of the companies to which they lend money.

**Paragraph 50, sentence 6.** The Note Investors were entirely dependent upon, and expecting to profit solely from, the Founders' expertise and efforts to trade using GK Strategies. Defendants deny the statements in paragraph 50, sentence 6. Specifically, the lenders were not "profiting solely from the Founders expertise and efforts to trade." The Lenders were profiting from the set rate of 18% interest they agreed to in the loan notes.

51.   **Paragraph 51, sentence 1.** No registration statements have ever been filed with the SEC or are in effect as to any offerings of the limited-partnership units in the VC Funds or the Investment Notes.  Defendants admit that the VC Funds and the loans were not registered because Defendants were informed by legal counsel that since the AUM has been less than $150M, full registration was not required.

**E.      Nanban Ventures and the Founders Misrepresented GK Strategies**

52.      **Paragraph 52, sentence 1.** Defendants made multiple misrepresentations and omissions about GK Strategies to the VC Fund Investors and Note Investors. As alleged in more detail below, the misstatements and omissions were made in the VC Funds' Private Placement Memorandum ("PPMs"), in videos and podcasts posted on the internet that remain available online, in investor web presentations, and orally to VC Fund Investors and Note Investors. Defendants deny ever making any misrepresentation in any of the mediums alleged in paragraphs 52, sentence 1.  Again, Defendants note that the SEC is mixing a cash flow metric with the profit metric to discuss returns.

53.      **Paragraph 53, sentence 1.** The Founders and Nanban Ventures made these misstatements and omissions about GK Strategies to investors in connection with the offers, purchases, and sales of the limited-partnership units in the VC Funds (including reinvestments therein) and the Investment Notes. Defendants deny ever making any misrepresentation in any of the mediums alleged in paragraphs 53, sentence 1.  Again, Defendants note that the SEC is mixing a cash flow metric with the profit metric to discuss returns.

**Paragraph 53, sentence 2.** The misrepresentations and omissions include the following (emphasis added):

a.      **Paragraph 53(a), sentence 1.** On December 2, 2020, Krishnan represented during a Better Wealth Podcast titled *Making a Killing With Index, Options, and The Asset with CEO of Nanban Investments* that was posted and remains available on

YouTube that:

> I started sharing with my friends and family my level 1, level 2 strategies, and **I copyrighted all of my five strategies under GK Strategies copyright**. So first two strategies, level 1, level 2,
> allows people to generate 18 to 30 percent on their own, okay, from cash flow perspective. My level 3, level 4, level 5 takes it to a completely different level. We, **we consistently generate more than a hundred percent in the higher level strategies....in any market condition**. That's the beauty, up, sideways, down market.
>
> So from 2009 till early part of 2020, volatility was low, right? . . . And our returns were between 18 to 24 percent still. . . . But with this year when volatility increased, you have no idea. **Our people are making 60 percent, 70 percent return this year**.
>
> Since 2001, **my worst year has been 21 percent up**.
>
> Just to tell you, in private fund **we are able to give 58 percent return every year**.
>
> But in Nanban Investments, which is our for-profit private fund business, let's say they invest hundred K. So that is their hundred K capital into our business. In the first year we would give them $58,000 return. That's 58 percent return. That's what we specialize in. **Even though we make more than hundred percent, we give 58 percent only to the investors**, rest goes to the company, and we do a lot of charitable work using that income.

Defendant Krishnan admits to the foregoing statements and notes that all are correct using the

cash flow metric based on the volatility at that point of time. Defendant Krishnan admits that

he inadvertently used the word "copyrighted" when he meant "trademarked" in the podcast

and respectfully states that because English is not his first language and the terms copyrighted

and trademarked are both specific legal terms, he mixed them up.

        b.    **Paragraph 53(b).** The PPMs for the VC Funds represent that Krishnan will use GK Strategies to outperform the market, as illustrated by the following statement from the Nanban Ventures AAA Fund PPM, which appears in similar form in the other VC Fund PPMs:

> [Krishnan] has been using "GK Strategies" to generate consistent returns from US financial market for himself and for his friends and family members.  As Chief Executive Officer and Portfolio manager of Nanban Investments LLC. **[Krishnan] is managing the private equity fund(s) to generate returns that will consistently over perform the S&P 500 Index**. **To achieve those kind of returns, [Krishnan] will be using his proprietary strategies**.

When asked to explain his claims that GK Strategies over performs the S&P 500 Index, Krishnan testified that he told investors that "[a]s long as the S&P 500 doesn't go to zero, my strategy **will outperform [the] S&P 500**" and do so "**[a]ll the time**" and "**it will beat the S&P 500 from cash flow perspective 100 percent of the time**."

Defendant Krishnan admits to the foregoing statements and notes that all are correct using the cash flow metric based on the volatility at that point of time..

        c.    **Paragraph 53(c).** On December 21, 2022, Krishnan represented, during an interview titled *Episode #79 GK's Way to Financial Freedom featuring Nanban GK* that was posted and remains available on YouTube, that:

> I don't even care if the market has dropped by 20 percent because I

know every month with 100 percent consistency and we will get cash. ... So, when you are getting cash every week, every month with 100 percent consistency, your second bank account will always. **It cannot go down**.

...it only takes one hour a week to do my strategies. That's all because it's purely mechanical. You don't look at any reports, no indicators, no charts. So, when I saw their lifestyle has improved so much because they have got that belief in their mind that my 600,000 is going to be safe, and **I am making every year 120,000, minimum at 20 percent . ... And in this market, the current market that is going on, the S&P is down 20 percent, volatility has gone up big time, people are going to make 40, 50 percent this year**... So that's the beauty of volatility [in our] strategy.

Defendant Krishnan admits to the foregoing statements and notes that all are correct using the cash flow metric based on the volatility at that point of time.

      d.     **Paragraph 53(d).** On August 9, 2021, Krishnan represented, during an interview on FunAsia Radio titled *Gopala Krishnan GK | Nanban Interview* that was posted and remains available on Facebook, that:

So in 2000 – from 2001 (inaudible) and I figured out that **this strategy works hundred percent of the time**. I didn't keep it with me because I believe in community growing together.

**From 2001 until now, consistent results**... And that is key to success.

**So when you are making cash flow every week with 100 percent consistency, all those amounts would add up to big profits later**.

Defendant Krishnan admits to the foregoing statements and notes that all are correct using the cash flow metric based on the volatility at that point of time.

e.    **Paragraph 53(i).** On November 5, 2021, during an interview titled

*Gopala "GK" Krishnan, Chairman & CEO, Nanban Group of Companies*, *DotCom*

*Magazine Exclusive Interview* that was posted and remains available on YouTube, Krishnan

represented that:

> So Nanban came into existence just 18 months ago because of the
> strategies called, "GK Strategies," that I had developed back in
> 2001, which had worked for me [and] my family office for many,
> many years, **with principal protection and consistent positive
> returns in any market conditions**.

Defendant Krishnan admits to the foregoing statements and notes that all are correct using the

cash flow metric based on the volatility at that point of time.

f.    **Paragraph 53(f).** On January 31, 2023, Krishnan represented during a

Nanban Growth Fund webinar made available online to potential investors that:

> So, it's a very, very diversified strategy that has been working in
> Nanban Ventures and **Nanban Ventures has delivered for the last
> 18 months consistent double-digit returns**.

Defendant Krishnan admits to the foregoing statements and notes that all are correct using the

cash flow metric based on the volatility at that point of time.

g.    **Paragraph 53(g).** On May 19, 2023, Krishnan represented during a

telephone call with a potential investor that:

> If you only want to participate in GK Strategies, that is our Nanban
> Hedge Fund where the minimum now is $100 million ... that is

where we apply level 1 to level 5 all the strategies to generate around 30% every year that is what our goal is through our Nanban Hedge Fund. And then we have the next best is Nanban Ventures where 60% of the capital goes to GK strategies, 20% goes to all kinds of real estate, and only 20% goes to all kinds of startups.... So our people are getting returns every year.... Our investor, who put $10 million is getting minimum, you know, around 20% a year.

What I meant in this podcast was, I think in 2020, the volatility in the market was very high. So GK strategy itself, would have generated 50, 60, 70% [e]very year instead of 20, 30%.

Defendant Krishnan is not sure if the date is correct, but admits to the foregoing statements and notes that all are correct using the cash flow metric based on the volatility at that point of time.

h.    **Paragraph 53(h).** In the spring of 2020, Krishnan told a Note Investor in Texas during a webinar that GK Strategies Levels One and Two would earn double-digit returns of 20-25 percent while at the same time being a conservative investment strategy that protected investor capital. He told the investor that GK Strategies would never lose more than 1-2 percent of an investor's capital and that his system *always* beat the stock market and an index like the S&P 500. Krishnan also told the investor that if he wanted to earn even higher returns from GK Strategies Levels Three, Four, and Five, he would have to invest directly with Krishnan and could earn an extra 5-15 percent in annual returns.

Defendants continue to object to the characterization of the lenders as "Note Investors." Defendant Krishnan is not sure if the date is correct, but admits to the foregoing statements and notes that all are correct using the cash flow metric based on the volatility at that point of time.

i.     **Paragraph 53(g).** On May 19, 2023, Krishnan represented during a

telephone call with a potential investor that:

> If you only want to participate in GK Strategies, that is our Nanban
> Hedge Fund where the minimum now is $100 million ... that is
> where we apply level 1 to level 5 all the strategies to generate around
> 30% every year that is what our goal is through our Nanban Hedge
> Fund. And then we have the next best is Nanban Ventures where
> 60% of the capital goes to GK strategies, 20% goes to all kinds of
> real estate, and only 20% goes to all kinds of startups.... So our
> people are getting returns every year.... Our investor, who put $10
> million is getting minimum, you know, around 20% a year.

> What I meant in this podcast was, I think in 2020, the volatility in
> the market was very high. So GK strategy itself, would have
> generated 50, 60, 70% [e]very year instead of 20, 30%.

In response to Paragraph 53(g), Defendant Krishnan is not sure if the date is correct, but admits

to the foregoing statements and notes that all are correct using the cash flow metric based on

the volatility at that point of time.

j.     **Paragraph 53(i).**  On October 19, 2022, Krishnan represented during a

Global Summit webinar made available online to potential investors that:

> So everything goes back to, within Nanban, Nanban is powered by
> GK Strategies.... It's after my name. **And it's copyrighted and
> patented in U.S.** So we use those strategies to make money.

In response to Paragraph 53(i), Defendant Krishnan is not sure if the date is correct, but admits

to the foregoing statements (with the exception of the copyrights/patented comment because

Krishnan meant trademark) and notes that all are correct using the cash flow metric based on

the volatility at that point of time.

k.      **Paragraph 53(g).** On May 19, 2023, Krishnan represented during a telephone call with a potential investor that:

> If you only want to participate in GK Strategies, that is our Nanban Hedge Fund where the minimum now is $100 million ... that is where we apply level 1 to level 5 all the strategies to generate around 30% every year that is what our goal is through our Nanban Hedge Fund. And then we have the next best is Nanban Ventures where 60% of the capital goes to GK strategies, 20% goes to all kinds of real estate, and only 20% goes to all kinds of startups.... So our people are getting returns every year.... Our investor, who put $10 million is getting minimum, you know, around 20% a year.
>
> What I meant in this podcast was, I think in 2020, the volatility in the market was very high. So GK strategy itself, would have generated 50, 60, 70% [e]very year instead of 20, 30%.

In response to Paragraph 53(g), Defendant Krishnan does not recall this specific call however he admits to the foregoing statements and notes that all are correct using the cash flow metric based on the volatility at that point of time. Defendant Krishnan believes that the percentages have changed as the proprietary investment strategy develops and receives/learns of new opportunities.

54.      **Paragraph 54, sentence 1.** The statements in paragraph 53 are false and misleading, because GK Strategies is not "proprietary," "copyrighted," "patented," or even "unique." Defendants admit that the statements in paragraph 54 sentence 1 were not copyrighted or patented, but were rather trademarked. Defendant Krishnan apologizes to the Court for his imperfect usage of the English language because English is not his first language and the terms are very specific legal terms.

**Paragraph 54, sentence 2.** There is no algorithm or other proprietary technology or

method underpinning GK Strategies. Defendants deny the statements in paragraphs 54, sentence 2.

**Paragraph 54, sentence 3.** GK Strategies is merely a covered call option investment strategy with put protection. Defendants object to the allegations in paragraph 54, sentence 3 as conclusory.

**Paragraph 54, sentence 4.** This is a widely known and publicly available technique. Defendants object to the allegations in paragraph 54, sentence 4 as conclusory.

55.    **Paragraph 55, sentence 1.** The statements in paragraph 53 are also false and misleading, because GK Strategies does not consistently outperform the S&P 500 index, which is a proxy for the public stock market. Defendants deny the statements in paragraph 55, sentence 1. Defendants incorporate their response to Paragraph 3, sentence 2  herein.

**Paragraph 55, sentence 2.** To the contrary, GK Strategies only does so in limited market scenarios. Defendants deny the statements in paragraph 55, sentence 2. Defendants incorporate their response to Paragraph 3, sentence 2  herein.

56.    **Paragraph 56.** The statements in paragraph 53 are also false and misleading, because GK Strategies does not always generate positive returns, and there are market conditions where GK Strategies generates negative returns. Defendants deny the statements in paragraph 56. Defendants incorporate their response to Paragraph 3, sentence 2  herein.

57.    **Paragraph 57, sentence 1.** The statements in paragraph 53 are also false and misleading, because, at the time they were made, GK Strategies had not consistently outperformed the S&P 500 index or obtained the high percentage returns that Krishnan

claimed. Defendants deny the statements in paragraph 57, sentence 1. Defendants incorporate their response to Paragraph 3, sentence 2  herein.

**Paragraph 57, sentence 2.** Trading records demonstrate that GK Strategies has not produced returns consistently exceeding the returns of the S&P 500 index. Defendants deny the statements in paragraph 57, sentence 2. Defendants incorporate their response to Paragraph 3, sentence 2  herein.

**Paragraph 57, sentence 3.** To the contrary, the returns were, with limited exceptions, lower than the returns of the S&P 500 index, lower than the percentage returns that Krishnan claimed, and negative on numerous occasions. Defendants deny the statements in paragraph 57, sentence 3. Defendants incorporate their response to Paragraph 3, sentence 2  herein.

58.   **Paragraph 58, sentence 1.** The statements in paragraph 53 are also false and misleading, because the Founders and Nanban Ventures omitted (a) their actual returns using GK Strategies and (b) that two Nanban hedge funds—which used GK Strategies—were closed, in part, due to investor complaints about poor performance. Defendants deny the statements in paragraph 58, sentence 1. Defendants incorporate their response to Paragraph 3, sentence 2 and Paragraph 26  herein.

**Paragraph 58, sentence 2.** These omissions were highly misleading in light of the other statements that the Founders and Nanban Ventures made about the performance of GK Strategies. Defendants deny the statements in paragraph 58, sentence 2.

59.   **Paragraph 59, sentence 1.** Nanban Ventures also falsely told hedge fund

investors—that they were also soliciting to invest in the VC Funds—that they were offering an exit to the hedge funds, because they could not fully deploy GK Strategies to protect intellectual property while they were under an SEC review. Defendants admit that they informed the hedge fund investors that they were closing the hedge funds based in part on the concerns about protection of intellectual property and the SEC review and other reasons. Defendants further deny the solicitation of the VC fund to Hedge fund investors. Upon request from exiting hedge fund investors, defendants informed them about Nanban VC Funds.

**Paragraph 59, sentence 2.** In fact, the hedge funds were actually closed because investors asked for their money back due to the hedge funds' poor performances, not to protect intellectual property in connection with an "SEC review" or otherwise.  Defendants deny paragraph 59 sentence 2 in entirety. Defendants admit that they informed the hedge fund investors that they were closing the hedge funds based in part on the concerns about protection of intellectual property, quarterly accounting issues and other operational challenges and the SEC review.

60.    **Paragraph 60, sentence 1.** The Founders and Nanban Ventures made the misstatements and omissions alleged above. Defendants deny the statements in paragraph 60, sentence 1.

**Paragraph 60, sentence 2.** As described above, Krishnan made most of the statements himself, and the other Founders also participated in one or more in-person meetings with Note Investors in which the misrepresentations were made. Defendants admit they participated in one or more in person meetings with lenders. Defendants all deny any

misrepresentations were made. Defendants continue to object to the mischaracterization of the lenders as "Note Investors" and deny any misrepresentations made.

**Paragraph 60, sentence 3.** All of the Founders and Nanban Ventures made the statements in the PPMs, because each of the Founders reviewed and approved the PPMs and they each had final authority over the contents of the PPMs. Defendants deny the statements in paragraph 60, sentence 3.

61.    **Paragraph 61, sentence 1.** The Founders knew, or were severely reckless in not knowing, that their statements and omissions about GK Strategies were false and misleading. Defendants all deny any misrepresentations were made.

**Paragraph 61, sentence 2.** The Founders made trades using GK Strategies in the hedge funds both independently and in concert. Defendants Krishnan, Gounder and Shanmugam all admit to using GK Strategies in the hedge funds.

**Paragraph 61, sentence 3.** Therefore, the Founders knew, or were severely reckless in not knowing, that GK Strategies did not perform as represented in the hedge funds. Defendants deny the statements in paragraph 61, sentence 3. Defendants incorporate their response to Paragraph 3, sentence 2 herein.

**Paragraph 61, sentence 4.** They perpetuated this misrepresentation when they authorized VC Fund Investors to receive PPMs claiming that Krishnan would apply proprietary strategies that would generate returns that would consistently over perform the S&P 500 Index. Defendants deny the allegations of misrepresentation in paragraph 61, sentence 4. Defendants incorporate their response to Paragraph 3, sentence 2 herein. Defendants object mischaracterization of the investment thesis and business model of the venture capital funds.

**Paragraph 61, sentence 5.** Additionally, the Founders all knew that the last two Nanban hedge funds were closed due to the poor performance of GK Strategies. Defendants deny the allegations made in paragraph 61, sentence 5. Defendants reiterated that they closed the hedge funds based in part on the concerns about protection of intellectual property, quarterly accounting issues and other operational challenges and the SEC review.

**Paragraph 61, sentence 6.** The Founders were also severely reckless because they did not analyze Krishnan's historical trading performance using GK Strategies prior to including the claim that the "proprietary strategies" would consistently over perform the S&P 500 Index in the VC Funds' PPMs. Defendants deny the allegations made in paragraph 61, sentence 6. The founders did back testing of the strategies to analyze the historical performance from cash flow perspective.

62.    **Paragraph 62, sentence 1.** These misrepresentations and omissions were material, because a reasonable investor would consider the fact that GK Strategies was not unique and did not have investment returns as represented in deciding whether to invest. Defendants deny the allegations made in paragraph 62, sentence 1.

**F.     Defendants Misrepresented Profits Earned and Misused Investor Funds**

63.    **Paragraph 63, sentence 1.** After Defendants induced investors to purchase the VC Fund units and the Investment Notes based on their false narrative of Krishnan's investing success, they misrepresented the performance of those investments (VC Funds and Investment Notes) and misused investor funds to induce additional investments and to keep their fraudulent enterprise afloat. Defendants deny the allegations made in paragraph 63, sentence 1.

**Paragraph 63, sentence 4.** In particular, Defendants misused investor funds by using

at least approximately $17.8 million of investor funds to make Ponzi payments—purported *profit* distributions to investors using, in substantial part, other investor funds. Defendants deny the allegations made in paragraph 63, sentence 4. Defendants incorporate their answer to Paragraph 2, herein.

### i.   *Profitability Misstatements to VC Fund Investors*

64.   **Paragraph 64, sentence 1.** The Limited Partnership Agreement ("LPA") for each VC Fund provides that investors are entitled to receive profit distributions if there is a positive net amount resulting from the allocation of profit and loss. Defendants state that the documents speak for themselves.

**Paragraph 64, sentence 2.** The LPAs further provide that the VC Fund Investors may elect to take distributions of their share of these profits in cash or to reinvest the amount back into the respective VC Funds in exchange for additional units. Defendants state that the documents speak for themselves.

65.   **Paragraph 65, sentence 1.** Nanban Ventures consistently represented to the VC Fund Investors at investor update webinars that all the Founders typically attended that the VC Funds were highly profitable. Defendant Nanban Ventures admits to representing that the VC Funds were highly profitable. Defendant believes that is a true statement considering the FMV of all assets held by the Nanban entities.

**Paragraph 65, sentence 2.** In total, between April 16, 2021 and July 18, 2023, Nanban Ventures, through its third-party fund administrator, told VC Fund Investors that the VC Funds had generated approximately $23.2 million in purported profits. Defendant Nanban Ventures admits to representing that the VC Funds were generating profits using various proprietary strategies including cash flow strategies. Defendant believes that is a true

statement considering the FMV of all assets held by the Nanban entities.

66.     **Paragraph 66.** In a webinar with investors in or around January 2023, Nanban Ventures, at the Founders' direction, provided the VC Fund Investors with a Schedule of Investments ("SOI") purportedly showing that the VC Funds had achieved profits of approximately $10 million in the second half of 2022. Defendants admit the statements in Paragraph 66 and believe them to be true statements.

67.     **Paragraph 67.** As alleged at paragraph 53 above, on a May 19, 2023 telephone call, Krishnan also represented to a potential investor that VC Fund investors were receiving minimum returns of 20% per year every year. Defendants do not recall making the alleged statements in paragraph 67. Defendants incorporate their response to Paragraph 53 herein.

68.     **Paragraph 68.** As another example, during a July 7, 2023 Nanban Ventures Fund Performance Review Webinar, Nanban Ventures' CFO represented to VC Fund Investors that the VC Funds had achieved profits of approximately $10.3 million from January 2023 to June of 2023 from the "fintechs" alone. Defendants admit the statements in Paragraph 66 and believe them to be true statements.

69.     **Paragraph 69.** Believing the VC Funds to be highly profitable, most investors chose to reinvest their share of purported profits in the VC Funds. Defendants object to the speculative and conclusory statement in paragraph 69 and is without sufficient information to admit or deny why an investor chose to reinvest.

70.     **Paragraph 70, sentence 1.** A smaller subset of investors chose to receive their share of purported profits as cash distributions. The Defendants admit that a number of investors chose to receive their cash distributions. Defendants object to the remainder of the conclusory statements in paragraph 70.

**Paragraph 70, sentence 2.** Between April 16, 2021 and July 18, 2023, the Founders caused the VC Funds to make purported profit payments of approximately $10.7 million to those investors. Defendants admit to distributing payments to VC Investors during the time frame alleged. Defendants object to the remainder of the conclusory statements in paragraph

**Paragraph 70, sentence 3.** These payments were themselves a representation of the VC Funds' purported profitability. Defendants objects to the allegations in paragraph 70, sentence 3 as conclusory and speculative.

71.    **Paragraph 71, sentence 1.** The Founders also made interest payments to the Note Investors, including interest payments that, at times, exceeded the 18% amount listed on the face of the Investment Notes. Defendants continue to object to the term "note investors" as a legal conclusion and a misnomer for the lenders who loaned money directly to the Founder Companies in exchange for a set 18% interest payment. Defendants admit to making proper interest payments to the lenders. Defendants admit to paying discretionary amounts over the 18% minimum in the Lender documents.

**Paragraph 71, sentence 2.** These payments were purportedly based on GK Strategies' trading profits exceeding 18%.  Defendants deny the paragraph in its entirety.

**Paragraph 71, sentence 3.** The interest payments to the Note Investors were, themselves, deceptive acts and false representations of profitability to the Note Investors. Defendants continue to object to the term "note investors" as a legal conclusion and a misnomer for the lenders who loaned money directly to the Founder Companies in exchange for a set 18% interest payment. Defendants deny the conclusory and inflammatory statements make in paragraph 71, sentence 3.

72.    **Paragraph 72, sentence 1.** Defendants' representations about the profitability

of the VC Funds and Investment Notes were false and misleading. Defendants deny the conclusory and inflammatory statements make in paragraph 72, sentence 1.

**Paragraph 72, sentence 2.** When the statements were made, the VC Funds had not achieved the represented profits. Again, Defendants incorporate their response to the cash flow versus "profits" metrics misnomer occurring throughout the Complaint. Defendants incorporate their more thorough response articulating GK Strategies in response to Paragraph 3, sentence 2, above. VC Funds did represent profits which came from operating companies.

**Paragraph 72, sentence 3.** In fact, the VC Funds could not have achieved the represented profits because the VC Funds achieved, *at most*, only $1.97 million in profits during the *entire* period of April 16, 2021 through July 18, 2023, most of which was actually derived from the sale of real estate. Defendants deny the statements made in paragraph 72, sentence 3.

**Paragraph 72, sentence 4.** This amounts to a return of only 2.2%. Defendants deny the statements made in paragraph 72, sentence 4.

**Paragraph 72, sentence 5.** During the same period, the Founder Companies suffered a net trading loss, and therefore did not have trading profits to support payments to Note Investors, let alone payments that exceeded 18%. Defendants deny the statements made in paragraph 72, sentence 5. Defendants note that the Complaint fails to note that payments also came from other sections of the proprietary strategies, including sales from the Solid Assets.

73.     **Paragraph 73, sentence 1.** As alleged below, any other purported profits were illusory. Defendants deny the statements made in paragraph 73, sentence 1.

**Paragraph 73, sentence 2.** Specifically, any other so-called profits to the VC Funds were not investment profits from fund investments in GK Strategies, start-up companies, or

real estate. Defendants deny the statements made in paragraph 73, sentence 1.

**Paragraph 73, sentence 3.** Instead, they were merely interest payments on related-party promissory notes entered into between the Founder Companies and other companies the Founders controlled. Defendants deny the statements made in paragraph 72, sentence 3.

### ii. Ponzi Payments to VC Fund, Note, and Hedge Fund Investors

74.    **Paragraph 74.** Between April 16, 2021 and July 18, 2023, the Founders and Nanban Ventures caused the VC Funds to pay approximately $10.7 million dollars to VC Fund investors who chose to receive purported profit distributions instead of reinvesting their profits. Defendants deny the statements made in paragraph 74, sentence 1. Defendants note that the Complaint fails to note that payments also came from other sections of the proprietary strategies, including sales from the Solid Assets.

75.    **Paragraph 75.** Between April 16, 2021 and July 18, 2023, the Founders caused the Founder Companies to pay approximately $21.04 million in interest payments and return of principal to Note Investors. Defendants deny the statements made in paragraph 75, sentence 1. Defendants note that the Complaint fails to note that payments also came from other sections of the proprietary strategies, including sales from the Solid Assets.

76.    **Paragraph 76.** At least approximately $17.8 million of these payments to VC Fund Investors and Note Investors (as alleged in the previous two paragraphs) were Ponzi payments that were sourced with funds from other investors. Defendants deny the allegations made in paragraph 76 and incorporate their response to the ponzi payment allegation made in response to paragraph 2.

77.    **Paragraph 77, sentence 1.** Additionally, in August 2022, the Founders closed out their two remaining hedge funds and purported to return the hedge fund investors'

principal with a small amount of profit. Defendants admit the hedge funds were closed and that payments were made to the investors, otherwise denied.

**Paragraph 77, sentence 2.** In reality, the hedge funds did not have enough money in their account to make these. Defendants admit that a portion of the hedge fund repayment came from the Founder companies' profits.

**Paragraph 77, sentence 3.** Instead, the Founders caused the Founder Companies to pay approximately $3.5 million to the hedge fund investors using investor funds received from the VC Fund Investors and the Note Investors.  Defendants deny ever using investor funds to pay other investors.

**Paragraph 77, sentence 4.** At least approximately $2.3 million of this $3.5 million was paid to hedge fund investors after the hedge funds had ceased operations. Consequently, the hedge fund investors received $2.3 million in Ponzi payments. Defendants deny the allegations made in paragraph 77 sentence 4 and incorporate their response to the ponzi payment allegation made in response to paragraph 2.

### Improper Payments to the Founders and Nanban Ventures

78.    **Paragraph 78, sentence 1.** Defendants also misused investor funds to compensate the Founders. Defendants deny the allegations made in paragraph 78, sentence 1.

**Paragraph 78, sentence 2.** The PPMs disclose to the VC Fund Investors that the Founders, through related entities, would make money in two ways: (a) a 2% AUM fee, and (b) the general partner of the VC Fund's share of any profits that exceeded 12-15%. Defendants state that the PPMs speak for themselves, but also state that they did not take payments from the VC Funds. Defendants deny that a management fee was charged.

Defendants admit that an operation fee of 2% was paid to run the fund. Defendants Krishnan, Gounder and Shanmugam deny taking any compensation from the operational fee. Defendants admit that the general partner receives a carried interest split which exceeds 12-15% on the distribution waterfall.

79.     **Paragraph 79, sentence 1.** The Founders did not disclose to Note Investors that they would take any portion of their principal investments for themselves, and at least one Note Investor in Texas specifically invested in an Investment Note and not a VC Fund to avoid paying AUM and general partner fees. Defendants continue to object to the term "note investors" as a legal conclusion and a misnomer for the lenders who loaned money directly to the Founder Companies in exchange for a set 18% interest payment. Defendants deny the conclusory and inflammatory statements make in paragraph 79, sentence 1. Defendants further object as speculation to the "reason" any particular lender loaned money to the Founder Companies.

80.     **Paragraph 80, sentence 1.** Yet, between July 29, 2021 and June 20, 2023, the Founders, acting through the Founder Companies, paid themselves at least approximately $6 million from commingled investor funds, including payments of approximately $3.3 million to Krishnan, $1.8 million to Gounder, and $900,000 to Shanmugam. Defendants deny the allegations made in paragraph 80, sentence 1.

**Paragraph 80, sentence 2.** In addition, the VC Funds transferred approximately $2 million in compensation to the VC Funds' general partner entities and management entities, including Nanban Ventures. Defendants deny the allegations made in paragraph 80, sentence 2.

**Paragraph 80, sentence 3.** These payments were not authorized by the VC Funds' documents and were also made, at least in substantial part, using investor funds. Defendants

state that the VC Funds documents speak for themselves. Defendants deny the allegations made in paragraph 80, sentence 3.

81.     **Paragraph 81, sentence 1.** Defendants knew, or were severely reckless in not knowing, that their misstatements and omissions about the profitability of the investments were false and misleading and that they were misusing investor funds. Defendants deny the allegations made in paragraph 81, sentence 1.

**Paragraph 81, sentence 2.** The Founders oversaw the investments for the VC Funds and the Founder Companies, participated in meetings about the status of the investments, and controlled the relevant bank accounts. Defendants admit the statements in paragraph 81, sentence 2.

**Paragraph 81, sentence 3.** As a result, the Founders knew, or were severely reckless in not knowing, that the VC Funds and Founder Companies were vastly overstating their profits. Defendants deny the allegations made in paragraph 81, sentence 3.

**Paragraph 81, sentence 4.** The Founders likewise knew that they were commingling investor funds and using investor funds to pay false profit distributions and themselves. Defendants deny the allegations made in paragraph 81, sentence 4.

82.     **Paragraph 82, sentence 1.** As alleged at paragraphs 37-39 above, the Founders and Nanban Ventures are investment advisers to the VC Funds. Defendants incorporate their responses to paragraphs 37-39 above.

**Paragraph 82, sentence 2.** They breached their fiduciary duty to the VC Funds by using fund assets in a manner that was not authorized by the VC Funds' documents, including the operative PPMs and limited partnership agreements. Defendants deny the allegations made in paragraph 82, sentence 2.

83.     **Paragraph 83.** The misuse of investor funds and the related misstatements and omissions are material, because a reasonable investor would consider the facts that they were receiving purported profit payments that were actually sourced from other investors' funds and that their investment was not profitable, or at best significantly less profitable than represented, important in deciding whether to invest or reinvest. Defendants deny the allegations made in paragraph 83.

**G.     Defendants Misrepresented the Investments and Hid Self-Dealing**

*i.     The Fake "Fintech" Companies*

84.     **Paragraph 84, sentence 1.** During a biannual investment meeting in or about January 2023, Nanban Ventures, at the Founders' direction, provided investors with the Statement of Investments (as previously defined, "SOI"). Defendants admit the statements in paragraph 84.

85.     **Paragraph 85, sentence 1.** The SOI represented that the VC Funds had invested $56 million (over 69% of the VC Funds' total assets) into three purported "fintech" companies identified as "NorthStars FinTech," "Himalayan FinTech," and "Sunshines FinTech." Defendants admit the statements in paragraph 85, sentence 1.

**Paragraph 85, sentence 2.** The SOI stated that these fintech investments had generated revenue of over $8 million for the VC Funds. Defendants admit that the SOI document speaks for itself. Defendants believe that the SOI financial report is accurate.

**Paragraph 85, sentence 3.** Many VC Fund investors reinvested their purported profits to purchase additional VC Fund units after receiving the SOI. Defendant objects to paragraph 85, sentence 3 as speculative.

86.     **Paragraph 86, sentence 1.** "NorthStars FinTech" (which is an assumed name

for Defendant GSM), "Himalayan FinTech" (which is Defendant Himalayan), and "Sunshines FinTech" (which is an assumed name for Defendant Centum) are not third-party companies. Defendants object to the term third-party companies as vague and ambiguous. Defendants admit that they manage and control the Fintech companies.

**Paragraph 86, sentence 2.** These are the Founder Companies, and they are all entities controlled by the Founders. Defendants admit the statements in paragraph 86, sentence 2.

**Paragraph 86, sentence 3.** The Founders' control of these entities was not disclosed to investors. Defendants deny the statements in paragraph 86, sentence 3. The control of those entities was disclosed to investors through webinars, PPM and other materials as appropriately guided by our counsel that founders will be implementing their proprietary strategy for cashflow and they will be managed / controlled or licensed by founders. Since then in every fund performance report cashflow was reported to investors.

87.    **Paragraph 87, sentence 1.** The Founder Companies are also not fintech companies. Defendants deny the statements in paragraph 87, sentence 1 and incorporate their response to paragraph 4.

**Paragraph 87, sentence 2.** GSM is a company that the Founders use to trade investor funds using GK Strategies, to issue Investment Notes, to make false profit distributions, and, in some instances, to purchase real estate. Defendants deny the statements in paragraph 87, sentence 2 and incorporate their response to paragraph 4.

**Paragraph 87, sentence 3.** Centum is an intermediary entity that the Founders use to issue Investment Notes, to shuttle investor funds to GSM, to make false profit distributions, and, in some cases, to purchase bonds and real estate. Defendants deny the statements in paragraph 87, sentence 3 and incorporate their response to paragraph 4.

**Paragraph 87, sentence 4.** Himalayan is an intermediary entity that the Founders use to issue Investment Notes, to shuttle investor funds to GSM and Centum, and to make false profit distributions. Defendants deny the statements in paragraph 87, sentence 4 and incorporate their response to paragraph 4.

88.     **Paragraph 88.** The Founder Companies are not engaged in the development of specific technologies used to enhance financial services, or engaged in any other activity that would characterize the entity as a fintech company. Defendants deny the allegations in paragraph 88, sentence 1 to the extent that the SEC is implying that the use of the word "Fintech" is improper. Defendants further state that the Founder companies use various financial techniques to invest to ensure they are able to successfully service the debt for long term.

89.     **Paragraph 89.** The Founder Companies have substantially no assets other than investor funds or assets purchased with investor funds. Defendants deny the allegations in paragraph 89.

90.     **Paragraph 90, sentence 1.** The Founder Companies are, in essence, undercapitalized companies that engage in no business other than receiving investor funds and trading or investing on behalf of the Founders using investor funds. Defendants deny the allegations in paragraph 90, sentence 1.

**Paragraph 90, sentence 2.** There were no fintech investments. Defendants deny the allegations in paragraph 90, sentence 2 as a mischaracterization.

##### ii.     *The Related Party Notes*

91.     **Paragraph 91, sentence 1.** The VC Funds did not use investor funds to trade using GK Strategies as represented. Defendants partially deny the allegations in paragraph

91, sentence 1. Defendants deny that there was a representative that GK Strategies was the only strategy being used, when the PPMs clearly state that proprietary strategies would be used. GK Strategies is only a portion of the proprietary strategies utilized in the Founder entities.

**Paragraph 91, sentence 2.** Instead, Defendants structured the VC Funds' purported GK Strategies investments as a series of unsecured investment loans ("Related Party Notes") evidenced by approximately 10 convertible promissory notes between the Founder Companies (as payors) and another VC Fund-related intermediary that the Founders also controlled (as payees). Defendants incorporate early objections to the characterization of the loans. Defendants deny the allegations in paragraph 91, sentence 2.

92.     **Paragraph 92, sentence 1.** The Related Party Notes totaled more than $70 million dollars, which includes the $56 million falsely referenced in the SOI as fintech investments. Defendants object to the term "related party notes" and the inflammatory characterization of anything being "falsely referenced." Defendants incorporate early objections to the characterization of the loans. Defendants deny the allegations in paragraph 92, sentence 1.

93.     **Paragraph 93, sentence 1.** The Founders commingled investor funds from all VC Fund Investor funds in one bank account, and then further commingled the funds in the bank accounts of various special purpose entities that the Founders controlled. Defendants object to the term "commingled. Defendants assert that the companies properly accounted for and booked all VC Investor Funds.

94.     **Paragraph 94.** From there, the Founders, using the Related Party Notes, transferred more than $70 million dollars of VC Fund Investor funds to the Founder

Companies where the funds were commingled with Note Investor funds. Defendants object to the term "commingled. Defendants assert that the companies properly accounted for and booked all VC Investor Funds.

95.     **Paragraph 95, sentence 1.** The Related Party Notes, which were not disclosed to investors, purportedly require the Founder Companies to pay 18% biannual interest to the intermediary Nanban companies, typically over a term of five years. Defendants object to the term "related party notes" and deny that they had any disclosure requirements related to loans to the Founder companies. Defendants incorporate early objections to the characterization of the loans. Defendants deny the allegations in paragraph 95, sentence 1.

**Paragraph 95, sentence 2.** The Related Party Notes do not give the VC Funds any ownership stake in the underlying companies or their investments. Defendants object to the term "related party notes" and deny that they had any disclosure requirements related to loans to the Founder companies. Defendants incorporate early objections to the characterization of the loans. Defendants deny the allegations in paragraph 95, sentence 2.

96.     **Paragraph 96.** The Founders also take the position that the Founder Companies are only required to pay interest on these Related Party Notes on a "best efforts basis." Defendants deny the allegations in paragraph 96.

97.     **Paragraph 97, sentence 1.** Even if the Founder Companies or their investments are highly profitable, and the Founder Companies choose to pay the interest (because they apparently claim that it is not required), the VC Funds' profits are purportedly capped at 18%. Defendants deny the allegations in paragraph 97, sentence 1.

**Paragraph 97, sentence 2.** Meanwhile, the VC Fund Investors have no protection if these uncapitalized entities fail to pay off the Related Party Notes, which are unsecured. Defendants

deny the allegations in paragraph 97, sentence 2.

98.    **Paragraph 98, sentence 1.** As a result, more than 78% of the VC Funds assets were deployed to the Related Party Notes. Defendants admit the statements in paragraph 98, sentence 1.

**Paragraph 98, sentence 2.** Nanban Ventures and the Founders used the Related Party Notes to create the false appearance of investment profit. Defendants deny the statements in paragraph 98, sentence 2.

99.    **Paragraph 99, sentence 1.** The Founders and Nanban Ventures did not disclose—and in fact actively concealed using assumed names—that the so-called fintech companies were the Founders' controlled entities and were not fintech companies. Defendants deny the allegations in paragraph 99, sentence 1.

**Paragraph 99, sentence 2.** The Founders and Nanban Ventures also did not disclose that the investments in the Founder Companies were loans, much less related-party loans. Defendants deny the allegations in paragraph 99, sentence 2.

**Paragraph 99, sentence 3.** The Founders and Nanban Ventures further failed to disclose that most of the VC Funds' capital was deployed to these purported Related Party Notes. Defendants deny the allegations in paragraph 99, sentence 3. Defendants further stated that any related party transactions were listed under conflict of interest section and risks section of the PPM as it was deemed appropriate by the counsel. Defendants further state that the Founders sent a disclosure notice to all investors, and nearly all investors signed a document clarifying above and it was produced to SEC.

100.    **Paragraph 100, sentence 1.** In addition to the SOI used to deceive VC Fund Investors, Krishnan also attempted to mislead a potential VC Fund Investor in a January 31,

2023 investor pitch. Defendants deny the allegations in paragraph 100, sentence 1.

**Paragraph 100, sentence 2.** During that investor pitch, Krishnan did not disclose his ownership or control of the Founder Companies, the loan structure, or that profits were tied to GK Strategies.  Defendants deny the allegations in paragraph 100, sentence 2.

**Paragraph 100, sentence 3.** Rather, Krishnan stated generically that Nanban Ventures was invested in "some very strategic private companies that are already producing cash flow." Defendant Krishnan does not recall making this statement and therefore denies it.

**Paragraph 100, sentence 4.**  Krishnan further gave the impression that the companies were arms-length third parties by stating, "[t]hey don't want to go public, but they all have been generating really good cash flow. They are allowing us to participate in their company." Defendant Krishnan does not recall making this statement and therefore denies it.

101.   **Paragraph 101, sentence 1.** The Founders and Nanban Ventures knew, or were severely reckless in not knowing, that their misstatements and omissions about the VC Funds' investments were false and misleading. Defendants deny the allegations in paragraph 101, sentence 1.

**Paragraph 101, sentence 2.** The Founders knew that they controlled the Founder Companies, and that these companies were neither independent third-party companies nor fintech companies. Defendants admit they controlled the Founder companies, but deny the remainder of the allegations in paragraph 101, sentence 2.

**Paragraph 101, sentence 3.** The Founders also met regularly to discuss the VC Funds' investments, so they knew, or were severely reckless in not knowing, that investor funds were being used to fund the purported loans between Nanban entities. Defendants deny the allegations in paragraph 101, sentence 3.

**Paragraph 101, sentence 4.** Gounder signed most or all Related Party Notes on behalf of GSM. Defendants continue to object to the term "related party notes," otherwise admit.

102.   **Paragraph 102, sentence 1.** As alleged at paragraphs 37-39 above, the Founders and Nanban Ventures are investment advisers to the VC Funds. Defendants incorporate their responses to paragraphs 37-39, above.

**Paragraph 102, sentence 2.** They breached their fiduciary duties to the VC Funds by, among other things, entering into the Related Party Notes, which were not in the VC Funds' best interest, and by failing to fully and fairly disclose that the VC Funds were investing in the Founder Companies. Defendants deny the allegations in paragraph 102, sentence 2.

103.   **Paragraph 103.** The misstatements and omissions about the VC Funds' investments were material, because a reasonable investor would consider the existence of a conflict of interest and the fact that their investment funds had not been invested as represented important in deciding whether to invest.  Defendants deny the allegations in paragraph 103.

104.   **Paragraph 104, sentence 1.** The Related Party Notes are securities under the Securities Act and the Exchange Act, which specifically include the term "notes" within the definition of securities. Defendants deny the allegations in paragraph 104, sentence 1.

**Paragraph 104, sentence 2.** In addition, the Related Party Notes are "investment contracts." Defendants deny the allegations in paragraph 104, sentence 2.

**Paragraph 104, sentence 3.** The VC Funds, through related entities, invested money to obtain fixed investment returns of 18% per year, typically for a period of five years. Defendants admit the statements in paragraph 104, sentence 3.

**Paragraph 104, sentence 4.** The VC Funds money was pooled with funds from other VC

Funds and Note Investors. Defendants deny the statements in paragraph 104, sentence 4.

**Paragraph 104, sentence 5.** The VC Funds were entirely dependent upon, and expecting to profit solely from, the Founders' expertise and efforts to trade using GK Strategies. Defendants deny the statements in paragraph 104, sentence 5.

105.    **Paragraph 105, sentence 1.** The Founders owned and controlled Nanban Ventures and each of the Founder Companies. Acting as a principal for their own accounts, the Founders sold the Related Party Notes to their advisory clients, the VC Funds. Defendants admit the statements in paragraph 105, sentence 1.

106.    **Paragraph 106.** Before the completion of the transactions in which the Founders sold the Related Party Notes, the Founders did not: (a) disclose the transactions in writing to their clients, (b) disclose the capacity in which they were acting, and/or (c) obtain the consent of the clients to engage in such transactions. Defendants deny the allegations in paragraph 106, sentence 1 (and continue to object to the term "related party notes").

**H.    Krishnan Misrepresented Nanban Ventures' AUM**

107.    **Paragraph 107, sentence 1.** To convince investors to invest in the VC Funds, Krishnan made several additional misrepresentations to investors about Nanban Ventures' purported size and AUM: Defendants deny Krishnan made any representation to anyone to invest in VC Funds

a.    On December 2, 2020, during a Better Wealth Podcast titled *Making a Killing With Index, Options, and The Asset with CEO of Nanban Investments* that was posted and remains posted on YouTube, Krishnan nodded in agreement when asked by the interviewer, "within less than a year, you guys have raised over $950 million?" Defendants Deny that Krishnan agreed with the interviewer that 950 million dollars were raised, but instead agreed

that GK Strategies had influenced 950 million dollars in the market by thousands of Nanbans who follow GK Strategies in their own trading account.

b.      In February 2021, during a YouTube video titled *How GK financial strategy won more than 25,000 people's confidence?* that was posted a year after the Nanban financial organization came into existence, Krishnan represented that Nanban was "almost a $1.2 billion company." Defendants Deny that Krishnan represented that Nanban Organization is a 1.2 Billion Dollars company, but instead meant that GK Strategies had influenced 1.2 Billion dollars in the market by thousands of Nanbans who follow GK Strategies in their own trading account

c.      In an undated interview posted on the Investment Fund Secrets (IFS) "Fund Launch" website and titled *Investment Fund Secrets*, Krishnan represented that "[w]e have gone from zero to $2.5 billion in 17 months." Defendants Deny that Krishnan represented that Nanban Organization is a 2.5 Billion Dollars company, but instead meant that GK Strategies had influenced 2.5 Billion dollars in the market by thousands of Nanbans who follow GK Strategies in their own trading account

d.      On October 19, 2022, during an IBC Tamil TV interview titled *Global Summit of Tamil Entrepreneurs & Professionals – Mr. Nanban GK Interview* that was posted and remains available on YouTube, Krishnan represented that "all the six divisions that we have is worth INR 96,000 crores [960,000,000,000 Indian Rupees] ($11.5 billion)." Defendants Deny that Krishnan represented that Nanban Organization is a $11.5 Billion Dollars

company, but instead meant that the influence of GK Strategies and the joint venture projects in across the world are estimated to be $11.2 Billion dollars in the market

108.    **Paragraph 108, sentence 1.** These statements are false and misleading. At the times that the statements were made, the Nanban-related companies never had more than $130 million in AUM. On some of the dates that the statements were made, the AUM was significantly less. Krishnan knew, or was severely reckless in not knowing, that the statements were false, because he had direct knowledge of the actual size of the assets he managed. The misstatements identified in paragraph 107 above were material, because a reasonable investor would find it important in making an investment decision to know that his or her investment adviser was grossly overstating the size, success, and bona fides of its business. Defendants deny all the statements in this paragraph in its entirety

I.      **Defendants Are Engaged in an Ongoing Fraud**

         *a.      Ongoing Offerings*

109.    **Paragraph 109, sentence 1.** Defendants continue to offer and sell securities. In 2023, the Founders sought to expand their operations globally and began soliciting international investors from the United Kingdom, Singapore, India, and the Gulf region to invest in the VC Funds. As recently as July 2023, Nanban Ventures launched a new venture capital fund called the Eco Harmony Fund LP. Upon information and belief, that offering is ongoing. Defendants admit that PPM was prepared for Eco Harmony Fund and it was provided voluntarily to SEC by defendants counsel for full transparency during the course of the investigation, before launching of fund. Defendants deny that any investors were ever solicited or any money raised in the Eco Harmony Fund. Defendants admit that they travelled internationally to attend entrepreneur conferences, summer vacation and also to find

companies to invest in. No Money was ever raised from any international investors.

110. **Paragraph 110, sentence 1.** At least as late as July 2023, Nanban Ventures continued to solicit current fund investors by offering them the option to reinvest purported profit distributions in the VC Funds or to make additional "top off" investments to buy additional units in the VC Funds. Further, a Note Investor deposit and a VC Fund Investor deposit was made at least as recently as July 12, 2023 and July 14, 2023, respectfully. Defendants deny soliciting any investors to re-invest their returns. It was an option provided to current investors as part of the structure of the fund. Defendant object to use of the "purported profit" in characterizing profit distributions. Defendants continue to object to characterization of the loans or lenders as "Note Investors" or "Investment Notes."

### b.    The Compliance Email and Acknowledgement Form

111. **Paragraph 111, sentence 1.** During the SEC's investigation that preceded the filing of this action, Defendants learned that the SEC had discovered that (a) the so-called "fintech" companies were not fintech companies and were related-party companies disguised as third-party companies, and (b) Defendants used the Related Party Notes to create the false appearance of investment profit. Defendants deny any proper purpose in naming the companies as "Fintech" companies as it is short form for "Financial Techniques", and further deny that there was any false appearance of investment profits

112. **Paragraph 112, sentence 1.** Thereafter, on or about August 9, 2023, Nanban Ventures emailed all VC Fund Investors ("Compliance Email"). The Compliance Email states that a forthcoming acknowledgment form ("Acknowledgement Form") was part of a "formal compliance process, [] to ensure that all [VC Fund] investors have a clear understanding of how earnings are derived." Defendants admit on sending this email

113.   **Paragraph 113, sentence 1.** The Acknowledgement Form purports to require investors to affirm that Nanban Ventures previously disclosed to them that the Founders owned and controlled the so-called fintech companies, which the VC Funds purportedly invested in "through debt notes to portfolio companies to generate minimum interest/return of 18% per year on a best effort basis [and] [u]sing proprietary cash flow strategies on market indices and bonds, Nanban Ventures invests through these companies (Centum FinTech LLC, Himalayan FinTech LLC and Sunshine FinTech LLC etc.) to provide semi-annual non-guaranteed earnings." Defendants admit sending the acknowledgement form to test the SEC belief that the ownership of the fintech companies and how the capital was invested through debt notes were previously disclosed to the investors and to verify in writing that such disclosure was previously made to the investors

114.   **Paragraph 114, sentence 1.** The Compliance Email and the Acknowledgement Form are false and misleading and are more deceptive acts in furtherance of Defendants' ongoing scheme to defraud. Defendants did not disclose the Founders' control of the Founder Companies, the Related Party Notes, or the loan terms when the VC Fund Investors invested or reinvested in the VC Funds and, if at all, only after Defendants became aware of the SEC raising this issue during its investigation. Defendants deny the whole paragraph in its entirety

115.   **Paragraph 115, sentence 1.** The Acknowledgement Form also contains misrepresentations and omissions about the so-called loan investments. The Acknowledgement Form:

> a.   falsely claims that the notes have *minimum* interest of 18%, when in fact interest is capped at a stated percentage;
>
> b.   states that interest on the notes will only be paid on a "best effort basis," when the face of the notes had no such

qualification;

c.     fails to disclose the trading losses that the Founder Companies have incurred from GK Strategies trading.

Defendants deny making any misrepresentations and omissions and object to use the phrase "loan investments" to investors. They are just loans from VC Funds lending capital to Founder companies. Though notes were to be serviced at 18% interest, founder companies gave discretionary amount above 18% and object to conclusion of trading losses.

116.    **Paragraph 116, sentence 1.** Defendants knew that these disclosures were not previously made in the manner represented in the Acknowledgement Form. In fact, Krishnan has previously admitted under oath that investors were not aware of the loans or their terms. Defendants are using the Compliance Email and Acknowledgement Form as deceptive devices, are falsely leading investors to believe they must sign the letter or potentially risk their investment, and are potentially causing investors to unknowingly comprise claims. Defendants deny all allegations in the paragraph in its entirety.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Exchange Act
Exchange Act Section 10(b) and Rule 10b-5 thereunder**

*Against all Defendants*

117.    Answering Paragraph 117 of the Complaint, to the extent any response is required, Defendants deny the allegations.

118.    Answering Paragraph 118 of the Complaint, to the extent any response is required, Defendants deny the allegations.

119.    Answering Paragraph 119 of the Complaint, to the extent any response is

required, Defendants deny the allegations.

## SECOND CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Securities Act
### Securities Act Section 17(a)

### *Against all Defendants*

122.   Answering Paragraph 120 of the Complaint, to the extent any response is required, Defendants deny the allegations.

123.   Answering Paragraph 121 of the Complaint, to the extent any response is required, Defendants deny the allegations.

124.   Answering Paragraph 122 of the Complaint, to the extent any response is required, Defendants deny the allegations.

## THIRD CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Advisers Act
### Advisers Act Sections 206(1) and (2)

### *Against Defendants Krishnan, Shanmugam, Gounder, and Nanban Ventures*

123.   Answering Paragraph 123 of the Complaint, to the extent any response is required, Defendants deny the allegations.

124.   Answering Paragraph 124 of the Complaint, to the extent any response is required, Defendants deny the allegations.

125.   Answering Paragraph 125 of the Complaint, to the extent any response is required, Defendants deny the allegations.

126.   Answering Paragraph 126 of the Complaint, to the extent any response is

required, Defendants deny the allegations.

## FOURTH CLAIM FOR RELIEF

### Violations of Section 206(3) of the Advisers Act

### *Against Defendants Krishnan, Shanmugam, Gounder, and Nanban Ventures*

127.   Answering Paragraph 127 of the Complaint, to the extent any response is required, Defendants deny the allegations.

128.   Answering Paragraph 128 of the Complaint, to the extent any response is required, Defendants deny the allegations.

129.   Answering Paragraph 129 of the Complaint, to the extent any response is required, Defendants deny the allegations.

## FIFTH CLAIM FOR RELIEF
### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder

### *Against Defendants Krishnan, Shanmugam, Gounder, and Nanban Ventures*

130.   Answering Paragraph 130 of the Complaint, to the extent any response is required, Defendants deny the allegations.

131.   Answering Paragraph 131 of the Complaint, to the extent any response is required, Defendants deny the allegations.

132.   Answering Paragraph 132 of the Complaint, to the extent any response is required, Defendants deny the allegations.

133.   Answering Paragraph 133 of the Complaint, to the extent any response is required, Defendants deny the allegations.

134.   Answering Paragraph 134 of the Complaint, to the extent any response is

required, Defendants deny the allegations.

## VI.     JURY TRIAL DEMAND

Defendants agree with the demand for a jury trial.

## VII.     RELIEF REQUESTED

Defendants deny that Plaintiff is entitled to the relief sought.

## <u>AFFIRMATIVE DEFENSES</u>

Defendants set forth below their affirmative defenses. By setting forth these affirmative defenses, Defendants do not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiff.  Moreover, nothing stated herein is intended or shall be construed as an acknowledgement that any particular issue or subject matter necessarily is relevant to Plaintiff's allegations.

### First Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by limitations.

## <u>PRAYER</u>

WHEREFORE, Defendants pray for judgment as follows:

1.      That Plaintiff take nothing by way of the Complaint;

2.      That the Complaint be dismissed with prejudice and judgment entered in favor of Defendants;

3.      That Defendants be awarded costs, disbursements and attorneys' fees in this action; and

4.      For such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Leslye E. Moseley*

David R. Clouston, Texas Bar No. 00787253
Leslye E. Moseley, Texas Bar No. 24044557
**SESSIONS ISRAEL & SHARTLE, LLC**
900 Jackson Street, Suite 440
Dallas, Texas 75202
Telephone:  214-741-3001
Facsimile: 214-741-3055
dclouston@sessions.legal
lmoseley@sessions.legal

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been sent via ECF on this 6th day of December, 2023 to the following counsel of record:

Keefe Bernstein
Jason P. Reinsch
Samantha Martin
Clemon Ashley
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
bernsteink@sec.gov
reinschj@sec.gov
martins@sec.gov
ashleyc@sec.gov

Counsel for Plaintiff, Securities and Exchange Commission

*/s/ Leslye E. Moseley*
Leslye E. Moseley